# STATE OF LOUISIANA

# COURT OF APPEAL, THIRD CIRCUIT

# 21-688

**STATE OF LOUISIANA**

**VERSUS**

**MICHAEL J. WORLEY**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TWENTY-EIGHTH JUDICIAL DISTRICT COURT
PARISH OF LASALLE, NO. 14-563
HONORABLE J. CHRISTOPHER PETERS, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**JONATHAN W. PERRY**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Candyce G. Perret, and Jonathan W. Perry, Judges.

**AFFIRMED.**

**Chad M. Ikerd**
**Ikerd Law Firm, LLC**
**Louisiana Appellate Project**
**Post Office Box 2125**
**Lafayette, Louisiana 70502**
**(337) 366-8994**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Michael J. Worley**


**J. Reed Walters**
**District Attorney, Twenty-Eighth Judicial District**
**Steven P. Kendrick**
**Assistant District Attorney**
**Post Office Box 1940**
**Jena, Louisiana 70601**
**(318) 992-8282**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**PERRY, Judge.**

Defendant, Michael J. Worley, appeals his conviction for second-degree murder, a violation of La.R.S. 14:30.1, for which he received a sentence of life at hard labor without benefit of parole, probation, or suspension of sentence. For the following reasons, we affirm Defendant's conviction.

**FACTS AND PROCEDURAL HISTORY**

On May 14, 2014, Defendant, Michael J. Worley, was charged by grand jury indictment with the second-degree murder of his wife, Mary. Pursuant to a motion filed by defense counsel, on February 20, 2015, the trial court appointed a sanity commission to determine Defendant's capacity to understand the proceedings and to determine Defendant's mental condition at the time of the offense. On January 7, 2016, the trial court found Defendant competent to proceed. After a five-day trial in May 2016, a unanimous jury found Defendant guilty of second-degree murder on May 27, 2016. Immediately after the jury's verdict, the trial court ordered a presentence investigation and set sentencing for July 5, 2016. On the date of sentencing, defense counsel orally moved for a post-verdict judgment of acquittal, which the trial court denied. The trial court then imposed a sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.

Finding the trial court granted Defendant an out-of-time appeal by granting his application for post-conviction relief, this court ordered the trial court to prepare an appellate record and submit it to this court. *State v. Worley*, 21-444 (La.App. 3 Cir. 8/4/21) (unpublished opinion), *writ denied*, 21-1206 (La. 1/12/22), 330 So.3d 611. Now before the court is a brief filed by Defendant, solely alleging the evidence

was insufficient to convict him of second-degree murder. For the reasons discussed, we find Defendant's assignment of error lacks merit.

## ERRORS PATENT

As required by La.Code Crim.P. art. 920, this court reviews all appeals for errors patent on the face of the record. After reviewing the record, we find a harmless error.

The trial court sentenced Defendant immediately after it denied Defendant's oral motion for post-verdict judgment of acquittal. Louisiana Code of Criminal Procedure Article 873 provides, in pertinent part:

> If a motion for a new trial, or in arrest of judgment, is filed, sentence shall not be imposed until at least twenty-four hours after the motion is overruled. If the defendant expressly waives a delay provided for in this article or pleads guilty, sentence may be imposed immediately.

Since La.Code Crim.P. art. 873 does not mention a motion for post-verdict judgment of acquittal, it is questionable whether a twenty-four-hour delay is required after the denial of such motion.

In *State v. Boyance*, 05-1068 (La.App. 3 Cir. 3/1/06), 924 So.2d 437, *writ denied*, 06-1285 (La. 11/22/06), 942 So.2d 1103, this court applied the twenty-four-hour delay to a motion for post-verdict judgment of acquittal but found the error was harmless since the defendant had not challenged the excessiveness of his sentence. *See, e.g., State v. Shepherd*, 02-1006 (La.App. 3 Cir. 3/5/03), 839 So.2d 553; *State v. Roberts*, 13-1064 (La.App. 3 Cir. 3/5/14) (unpublished opinion); and *State v. Sherman*, 11-1042 (La.App. 3 Cir. 4/4/12) (unpublished opinion), *writ denied*, 12-1433 (La. 1/11/13), 106 So.3d 547.

In this case, Defendant does not argue excessiveness of his sentence on appeal, and he does not claim he was prejudiced by the lack of delay. Therefore, even

assuming the delay applies, we find that any possible error in this respect is harmless because Defendant neither contests his sentence nor argues prejudice from the trial court's immediate sentencing.

## LAW AND DISCUSSION

Defendant alleges the State failed to prove he killed his wife when there was no forensic evidence, no direct evidence, and no eyewitness testimony. According to Defendant, the State's case relied on "weak circumstantial coincidences."

The following jurisprudence sets forth the standard of review in this case:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La. 1981). It is the role of the fact finder to weigh the respective credibilities of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See Graffagnino*, 436 So.2d at 563, *citing State v. Richardson*, 425 So.2d 1228 (La.1983). To obtain a conviction, the elements of the crime must be proven beyond a reasonable doubt.

*State v. Thacker*, 13-516, p. 5 (La.App. 3 Cir. 1/28/15), 157 So.3d 798, 804 (quoting *State v. Freeman*, 01-997, pp. 2-3 (La.App. 3 Cir. 12/12/01), 801 So.2d 578, 580).

As for appellate review in cases relying on circumstantial evidence, this court has stated the following:

> When the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that the state "must exclude every reasonable hypothesis of innocence" in order to convict. *State v. Camp*, 446 So.2d 1207, 1209 (La.1984). "Circumstantial evidence consists of proof of collateral facts and circumstances from which elemental factors may be inferred according to reason, experience and common sense." *State v. Burns*, 441 So.2d 843, 845 (La.App. 3 Cir.1983). However, La.R.S.

3

15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. The statute serves as a guide for the jury when considering circumstantial evidence. On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded. *State v. Williams*, 13-497 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, *writ denied*, 13-2774 (La. 5/16/14), 139 So.3d 1024.

*State v. Baumberger*, 15-1056, pp. 10-11 (La.App. 3 Cir. 6/1/16), 200 So.3d 817, 826-27, *writ denied*, 16-1251 (La. 5/26/17), 221 So.3d 859, *cert. denied*, 138 S.Ct. 392 (2017).

*Evidence at Trial*

The first witness to testify for the State was Jessica Dorsey, a Communications Deputy with the Rapides Parish Sheriff's Office. Deputy Dorsey testified that on March 13, 2014, Defendant walked into the substation in Rapides Parish to report his wife as missing. Deputy Dorsey testified that Defendant told her that he first stopped by the Pineville Police Department, where he was told to contact the substation. According to Deputy Dorsey, Defendant was nervous and "[n]ot too sincere." When asked what specifically Defendant told her, Deputy Dorsey testified:

A.   He told me that his wife was missing.

Q.   Okay.

A.   That she went to Wal-Mart with two subjects that he didn't know and hadn't returned.

Q.   Did he tell you what Wal-Mart?

A.   At first he said he didn't know which Wal-Mart. And then he told me the Wal-Mart in Jena.

. . . .

Q.   Did he describe [why] he thought that, if she was with anyone?

A.   He told me that he saw her leave with a black male and a white female. Someone from down south that he'd never met before.

4

When asked if she made any observations regarding Defendant's demeanor, Deputy Dorsey testified:

> A. He was slightly calm. When he said [he] was worried about her he would try to cry and make himself cry but there were no tears. Then he would just snap back into his normal self. I mean, just friendly.

Deputy Dorsey called her sergeant, Jason Hagan, and stated that something seemed off with Defendant. According to Deputy Dorsey, Sergeant Hagan told Defendant to give his wife some more time to return home. Defendant returned approximately four hours later and filled out some paperwork. Deputy Dorsey described her second encounter with Defendant as similar to the first:

> Q. Okay. And describe that, please.
>
> A. Still friendly, you know, he was very talkative and very nice. But the same as he was concerned about her one second and then the next second he would start to cry and then snap back to his normal self. . . .
>
> Q. You took that as odd?
>
> A. I did.

Jeremy Sharp, a corporal with the Rapides Parish Sheriff's Office, testified that on March 13, 2014, he took Defendant's initial complaint regarding his missing wife. Defendant told Corporal Sharp that his wife had left earlier that morning, while he was either taking a shower or in the bathroom. According to Corporal Sharp, Defendant stated that his wife said she was going with "some friends" to the Jonesville or Jena area. Defendant did not know the names of the friends or the type of vehicle they were driving. Corporal Sharp noted, however, that Defendant said his wife had known the friends since the 1980s. Defendant also informed the corporal that his wife had taken some cash from the safe before she left and that she had left her cell phone and credit cards at home. Corporal Sharp then read the following statement given by Defendant:

> A. Sure. "On 3-12-2014 at 10:00 p.m. wife told me she was going to Jena with a friend. Drop off her husband at work and go eat and shop

5

at Wal-Mart. On 3-13-2014 my wife shower[ed] and then I went shower[ed] around 8:30[.] 9:45 a.m. she came find me in the shower. Said they were here. She had to go. I asked if they can wait five minutes. She called, they to [sic] leave, husband was running late. Said bye. Love you. I said love you back. I got out of shower [and] put pj's on. Looked through the front door. Did not see vehicle." Verbatim.

Sergeant Jason Hagan of the Rapides Parish Sheriff's Office testified that he spoke with Defendant in March 2013. When asked to describe Defendant's demeanor, Sergeant Hagan replied:

A. I can't really say, sir. I mean, he seemed almost panicked. He told me that his wife had gone to, they were headed to either Jena or Jonesville that morning and that she was due back by about 3:00 that afternoon. He came to the substation a little after 5, I'm thinking it was right around 5:20 because we had just come on shift. And, so, if she was overdue, she was only two hours overdue. And he just seemed to be real panicked for somebody who – if my wife was gone for two hours overdue than I probably wouldn't think all that of it. You know.

Sergeant Hagan thought it was peculiar that Defendant could not tell him the names of the friends with whom his wife left. Defendant told the sergeant that he did not think of asking for their names since his wife had known them since the 1980s. When asked what else Defendant told him, Sergeant Hagan responded:

A. Let's see, I asked him if he had tried to call her and he said, no, she had left her cell phone at home. Which agin [sic], I thought that was peculiar. My wife doesn't go anywhere without her cell phone. Especially out of town shopping. Let's see, what else did he tell me? After she didn't show up at 3 he, when he came to the substation he, when I say he was in a state of panic he uh, he swore up and down that something had happened to her. And I said, well, how do you know that something has happened to her? You know? And he couldn't really answer that question. So I said, okay and just moved on.

Q. Did he give you any idea about where to look?

A. He told me that he felt like something had happened to her and that we needed to get a search party together and go look somewhere off of 28. I said, okay. I said, well hold up, she's only two hours overdue. I don't feel like we're there yet. Really, the way I felt, I felt as though, you know, as I was talking to him he wasn't really telling me the whole story, which I get sometimes. People will call and report people missing for all sorts of reasons.

6

Finally, when asked if Defendant gave any indication why he thought his wife would pull off of Highway 28 onto another road, Sergeant Hagan responded, "No sir."

On cross-examination, Sergeant Hagan testified that between Defendant's residence and Jena, there were lots of woods, the Dewey Wills Wildlife Area, residential areas, and waterways. When asked by defense counsel if the logical place to look for the victim would be Dewey Wills, Sergeant Hagan replied, "I suppose so, sir. If she was headed this [sic] direction." Finally, Sergeant Hagan acknowledged that he had never met either Defendant or the victim, so he did not know whether Defendant was a worrier and did not know whether the victim was normally punctual. Sergeant Hagan agreed that Defendant seemed to be concerned about his wife not being back on time.

On re-direct, Sergeant Hagan agreed that if the victim did go to Jena on the day in question, he did not know that she took Highway 28 instead of another path. On re-cross, however, Sergeant Hagan agreed that if Nickel Loop Road (the road on which Defendant resided) was right off of Highway 28, it would make sense for the victim to go to Jena via Highway 28.

After Detective Tracy Clark testified as to the receipt of certain items into evidence, the following stipulations were submitted to the jury:

- In accordance with the report of the forensic pathologist, the victim died of a gunshot wound to the head. A copy of the autopsy report was admitted into evidence as part of the stipulation.

- Defendant entered Renegade Harley Davidson at 11:37 a.m. on Thursday, March 13, 2014.

- While there, Defendant browsed, bought various Harley Davidson paraphernalia, and purchased a motorcycle.

- Defendant was last seen at Renegade Harley Davidson at 1:48 p.m. on March 13, 2014.

7

- While at Renegade Harley Davidson, Defendant was clothed in a hat with an orange front and camo back, maroon shirt, brown lace-up boots, and blue jeans.

When publishing the autopsy report to the jury, the State noted a portion of the report that said the victim suffered "no non gunshot wound injuries[,] [i]ncluding no injuries to the hands."

Michelle Corley worked with the victim at the Pineville Wal-Mart for approximately four years. Ms. Corley described the victim as "the sweetest person" she had ever met, as very quiet, and very nice. According to Ms. Corley, the victim loved her family. Although she acknowledged that she did not socialize with the victim outside of work, Ms. Corley testified that the victim did not talk about meeting new friends in the months before she died and did not mention having a friendship with a "mixed-race couple." Ms. Corley described the victim as being meticulous and "very, very well organized and very put together."

Ms. Corley testified that as a Wal-Mart employee, she was given a discount card that allowed her to get ten percent off of non-food items. According to Ms. Corley, an employee cannot get the discount if they do not have the discount card. Thus, Ms. Corley makes it a habit, she testified, to have it with her when she shops at Wal-Mart.

Ms. Corley testified that she and some others took food and drinks to Defendant the Saturday after the victim was killed. While they were there, Defendant talked a lot about the victim, that he loved her and that she was the best ever. When asked if Defendant said anything about the people who picked the victim up the morning she went missing, Ms. Corley replied, "He said he came out of the shower and she was gone. And he saw a vehicle drive off." Ms. Corley did not think Defendant told her how the victim knew the people she drove off with but then testified: "Maybe from church. I don't really recall that." Ms. Corley testified that

8

she did not "gather" that the victim had a social life outside of work but that she talked about how much she loved her family.

When asked if the victim ever mentioned anything about motorcycles, Ms. Corley replied, "Never." While working with the victim during the week she was killed, Ms. Corley never heard the victim mention that she was planning to trade her Trailblazer in for a motorcycle.

On cross, Ms. Corley agreed that the victim was a very quiet person and "[a]lmost reserved in a way." Defense counsel asked, "So, you wouldn't find it unusual that she wouldn't share with you what she was thinking as far as any purchases with her husband?" Ms. Corley responded, "No." When asked if she knew of any problems between the victim and her husband, Ms. Corley replied, "No."

Karen Coolman, the victim's supervisor at Wal-Mart, first learned of the victim's death when one of her salesclerks called to tell her the victim was missing, and that Defendant was looking for her. Defendant himself also called Ms. Coolman on Thursday, March 13, to tell her the victim was missing. Defendant asked Ms. Coolman if she had heard from the victim and if she knew anyone that had seen or heard from her. When asked if Defendant said anything about who the victim might be with, Ms. Coolman replied, "He said that there was a couple that had went to their church, to her church that she had kind of become friends with and that she had left with them." Defendant also told Ms. Coolman that the friends were a white female and a black male that she had known from a long time ago. Ms. Coolman further testified that Defendant called her again the next day to tell her that the victim's body had been found. On Saturday, March 15, 2014, Defendant called Ms. Coolman once again, this time inquiring about the victim's life insurance policy.

Ms. Coolman testified that she had worked with the victim for about four years and did not know of the victim having friends outside of work. When asked if the victim had ever mentioned a couple fitting the description given by Defendant, Ms. Coolman replied, "Never." Ms. Coolman further testified that the victim never mentioned motorcycles and never mentioned that she was thinking of getting back into riding. According to Ms. Coolman, the victim talked about her sisters, her children, her grandchildren's ball games, and church. Ms. Coolman testified that she thinks she would have known if the victim saw others at Wal-Mart socially.

On cross, Ms. Coolman described her relationship with the victim as "her boss and her friend." Ms. Coolman agreed that she and the victim worked together but did not socialize. When asked if she would describe her friendship with the victim as intimate or casual, Ms. Coolman replied, "[c]asual." According to Ms. Coolman, the victim did not mention any of the friends she had prior to moving to Pineville. When asked if Defendant was referring to a church here or one from back home, i.e., Larose, when he stated the victim knew the couple from church, Ms. Coolman testified Defendant specifically said a church here, although she did not know which one. Ms. Coolman affirmed that Defendant said "it was somebody that . . . she knew prior to moving up here[.]"

Ms. Coolman agreed that it was not unusual for Defendant to call her about the victim's life insurance policy since Defendant needed that information to make funeral arrangements. As for the victim never mentioning that she wanted a motorcycle, Ms. Coolman testified that the victim never mentioned that she and Defendant used to have a motorcycle. In fact, Ms. Coolman testified that the victim did not talk about any details concerning her husband. When asked how she would have known if the victim had a girls' night with friends, Ms. Coolman responded: "I would think she would tell me. We worked side by side with each other and we

10

talked while we worked." Although the victim did not talk about non-work friends, Ms. Coolman testified that the victim "talked about her family a lot."

Kristopher James Keene, an assistant manager at Wal-Mart, testified that he worked with the victim. Mr. Keene testified as follows regarding his interaction with Defendant at the vigil held for the victim:

Q. Okay. And can you describe – you spoke to Mr. Worley on that night?

A. Yes.

Q. And how would you describe that interaction? Let me ask another question. Have you ever met Mr. Worley before?

A. No.

Q. Okay. So, can you describe that interaction, please?

A. He arrived for the vigil and Karen introduced him to me and I shook his hand. I took a couple of steps back, away from him, right after that.

Q. How so?

A. The energy, I guess.

Q. Did you make any observations about his demeanor at that time?

A. He had a flat effect [sic] to him.

As for his discussion with Defendant regarding the couple the victim was allegedly with, Mr. Keene testified:

Q. What did he tell you about those individuals and the circumstances upon which Mary went missing?

A. Other than she was supposed to be helping some people with church and not much after that.

Q. When you say, helping some people with church, what, can you elaborate on that?

A. There was no elaboration on it.

Q. But he associated those two people with church?

A.    Yes.

When asked if Defendant was distraught or composed at the vigil, Mr. Keene replied, "Very composed."

On cross-examination, Mr. Keene explained that when he testified Defendant had a "flat effect," he meant that there "seemed to be no real emotion one way or the other, with him." Mr. Keene agreed that he had never met Defendant prior to the vigil and did not know anything about his personality or demeanor. When asked what about Defendant's demeanor caused him to take a step back, Mr. Keene replied, "Being completely composed and having no emotion."

The next witness, Edward John Trahan, Jr., testified that he was a biologist with the Louisiana Department of Wildlife and Fisheries and was stationed on "Dewey Wills Wildlife Management Area." Mr. Trahan testified that he met Defendant four or five years before and that Defendant would frequent his office to ask hunting and fishing questions. According to Mr. Trahan, he drove right through Dewey Wills Wildlife Management Area when he drove from his home in Pineville to the courthouse in Jena. Mr. Trahan testified that the road off of which the victim's body was found was Alligator Bayou Road. When asked if he knew where Defendant hunted in the wildlife management area, Mr. Trahan testified, "[U]sually I'd see his Jeep parked just south of the headquarters off Hunt Road." Mr. Trahan further explained that if a person wanted to get to headquarters from Highway 28, the person would pass through the woods before getting to a four-way intersection, at which the person would turn right for Hunt Road or left for headquarters. When asked how Alligator Bayou fit in, Mr. Trahan responded:

A.    Alligator Bayou is, I don't know, five or six miles prior to getting to the headquarters. Before Headquarters Road. It's on the other side of the Diversion Canal from Headquarters Road.

Mr. Trahan testified that he received a call from Defendant on Friday, March 14, 2014. Mr. Trahan described the conversation with Defendant as follows:

A. I remember I woke up that morning. I wasn't going to go to work. I wasn't feeling well. And I got the call from Mike. I asked him, hey, how ya doing? He goes, awe not well. I go, what's the matter? And he says, my wife. And I said, well, what's wrong? And he said, she left. So I kept asking, you know, left how? What happened?

Q. When you say you kept asking, are you describing that as having been at a loss for words?

A. He was kind of, yeah, he was kind of nervous. I guess, didn't know where to get the next word from. Kind of confused, maybe.

Q. Okay. And so you asked him some questions to try to –

A. I was asking him, trying to get some information. I mean, you know, he called me. You know, what's going on? So, he said she had gone to, she had left the previous night and had gone to Jena with some friends. And I said, well, have you called her? And he said she didn't have her phone. I asked if he had called the State Police or the sheriff's department and he said, no, that he hadn't called them. That he was – he asked me then if I would check out some of the roads on Dewey Wills and see, you know, if I found anything. So, I did that.

Q. Okay. And did he give you any reason to believe that she would have pulled off of 28 and be there?

A. Not really. Just the fact that they went in that direction. And part of my job is we do missing persons, you know, go look for lost people. So, you know, I knew the guy so I figured, you know, I'll go look. Maybe they had a breakdown? I didn't know.

Q. Did he give you any reason to believe if they had a breakdown that they would be off of 28?

A. No.

Mr. Trahan first searched Alligator Bayou Road and then every side road but did not find anything.

When asked if Defendant described the vehicle that Mr. Trahan should be looking for, Mr. Trahan responded:

A. He said he did not see the vehicle. That she left the house real fast. He didn't see the vehicle. And then she was gone.

13

Q. And did he – did he tell you if anybody had told him what that vehicle might look like?

A. Not to my knowledge. No, I didn't, huh-uh.

On cross-examination, Mr. Trahan testified that when he asked for a description of the vehicle, Defendant was "kind of at a loss for words[.]" Mr. Trahan agreed that Defendant could have been upset rather than nervous or confused. Mr. Trahan believed Defendant called him the day after the victim left, which was a Friday. According to Mr. Trahan, Defendant told him that "they had gone out the previous night."

When asked how large of an area Dewey Wills was, Mr. Trahan responded, "62,000 acres[,]" which is "ten square miles." To Mr. Trahan's knowledge, Defendant did not hunt off of Alligator Bayou. According to Mr. Trahan, Defendant did not specifically ask him to search Alligator Bayou Road but the side roads off of Highway 28.

Clinton Worley, the victim and Defendant's son, testified at trial. Clinton described his mother as very loving, caring, and devoted to her family and friends. The last time Clinton spoke with his mom was two or three weeks before she was killed. According to Clinton, his mom was not the type to "venture out" and her friends were mainly work-related. Clinton also stated that his mom did not like to go shopping. Clinton explained:

> A. Cause she was never the type. I mean, no matter what it is or what it was, you know, she would do what she had to do but she wasn't one just to say I'm going to go this weekend and I'm going to make a day of shopping of it. She was never one to do so.

When asked if he knew of his mom having a friendship with a mixed-race couple, Clinton replied, "No sir." As for whether his mom and dad had arguments over his dad buying stuff, Clinton said his mom would call on occasion to vent about

14

his dad's motorcycle purchases. Clinton testified that his mom was not "totally fond" of Defendant's motorcycle purchases. Considering Defendant's health, Clinton testified, his mom did not want him to have a motorcycle. When asked if this was a long-standing issue between his mom and dad, Clinton replied, "Yes sir."

When the State asked Clinton about Defendant's statement in his interview regarding his mom running off with people and always coming back, Clinton testified that he had never known his mom to do such a thing. Clinton also never knew of his mom to go on a "girls night out." Clinton also testified that his mom never expressed any interest in Harley Davidson apparel, nor did he recall seeing her wearing such apparel.

The State then asked Clinton if he knew Johnny Crosby. The State told Clinton that in Defendant's statement to police, Defendant stated he sold a gun to Bigfoot about a year ago. Clinton testified that Johnny Crosby's nickname was Bigfoot and that he died in 2011 or 2012.

As for the day he found out his mom was missing, Clinton testified that his brother called to tell him that Defendant said the victim was missing. Clinton and his brother went to Defendant's house the next morning for support. When asked what he recalled about his conversation with Defendant, Clinton replied: "My father. The story, to me, was farfetched." Clinton explained the story his father told him:

> A.     That mom had left to go shopping at a Wal-Mart with friends that she'd been knowing from the [1980s]. Which was a white lady and a black male. The story that he provided to us that he was a known criminal. An ex-criminal. He had just recently gotten out or whatnot. And they was [sic] going shopping together. Personally, the story is unbelievable.

When asked if Defendant said anything to him about a bike trip, Clinton testified that Defendant said he purchased the trike, three-wheeled motorcycle, so

that Defendant and the victim could take vacations. Clinton testified that he never had an interaction with his mom that would suggest that she would want to take such a vacation.

Clinton testified that he knew his father to be a lover of guns and that he always had them when Clinton was growing up. When asked if he ever knew of a time when Defendant had only one gun in the house, Clinton replied, "Not that I can recall, just one."

Clinton testified that his parents' interactions with each other were great and that his dad took an interest in what his mom was doing. Clinton also testified that he had seen his dad cry with tears on occasion. As far as Defendant's demeanor during his interview with police, the following colloquy took place:

Q. You saw his recorded interview. Yes?

A. Yes sir.

Q. You listened to the way his mouth sounded as he, whenever he found out from the detectives that your mom was murdered?

A. Yes sir.

Q. Did that appear genuine to you, based on your experience with him?

A. No sir.

Finally, Clinton agreed that he would describe his mom as meticulous. When asked if he ever knew her to be a person that would leave her purse or keys, Clinton replied, "No."

On cross-examination, Clinton stated that he had been living away from home approximately fourteen years prior to his mom's death. Although Clinton visited his parents when they lived in Larose, he did not visit with them often when they moved to Pineville. The last time Clinton visited his parents' home was about a year before his mom's death. Clinton described his relationship with his mom as "[a]s close as

we could be" and his relationship with Defendant as "[a]bout the same." Clinton agreed that it was possible that his mom had friends, even a mixed-race couple, of whom he was not aware. Even though he did not recall his mom ever going on a "girls night out," Clinton agreed that he had been away from home for fourteen years. Clinton also agreed that even though his mom always objected to Defendant getting a motorcycle, she eventually let him buy it. Since Defendant previously bought two-wheeled motorcycles, Clinton agreed that it was possible his mom agreed to the trike since it was safer.

When asked if he recalled whether Defendant had a Glock 9mm prior to the one he bought in 2014, Clinton testified that he knew Defendant had one but was not sure of the time frame. Clinton thought it was sometime before his mother's death. Defense counsel asked Clinton if he noticed any guns in the house when he visited about a year before the victim died, and Clinton stated that he did not see any. Clinton explained that they did not look at or discuss the weapons then. Clinton agreed when defense counsel asked, "So, as of a year prior to your mother's death you're not even sure if he had any guns in the house[.]"

When asked why he thought Defendant's story was unbelievable, Clinton answered:

> A.     Because I've not known for my father to act that way. As far as not knowing who and names. As far as his knowledge of someone being out of a correctional facility and allowing my mother to go anywhere with them. And especially not knowing who. It's unbelievable.

Clinton testified that he had seen his father cry before and believed he shed genuine tears when Clinton was there with him. According to Clinton, Defendant did not work, so he depended on the victim's income. Although Clinton believed Defendant received a social security or disability check, Clinton did not think it was enough to meet Defendant's financial needs.

Clinton did not recall his mom ever going out or having lunch or coffee with friends. Clinton, however, acknowledged that his mom may have changed since he moved out. Finally, Clinton agreed that his father was a loving and caring husband who helped his mother around the house.

On re-direct, the following colloquy took place between Clinton and the prosecutor:

Q. Mr. Hickman asked you why you didn't believe your dad's story. And I want to go back into that if you don't mind.

A. Okay.

Q. I think your response was something to the effect of he never would have allowed her to go off with people he didn't know. A felon who had just gotten out of jail.

A. Correct.

Q. Okay. Based on everything that you know, what other reasons do you have that you don't believe kind of the entirety of your dad's story?

A. It's really all of it. It's the actions of it. The, really to me it's just an unbelievable story. Really. That's the best I can answer it.

When asked if he had any ill feelings for his father that would cause him to testify the way he had, Clinton answered, "No, sir."

Lindsey Lewis, the internet manager of Renegade Harley Davidson, testified that on October 31, 2013, Defendant made an internet inquiry on a motorcycle. According to Ms. Lewis, Defendant made an offer of $32,000.00 on a trike. Ms. Lewis left Defendant a voicemail and corresponded with him via email. When asked what she and Defendant corresponded about, Ms. Lewis replied:

A. Just very simple. Kind of just went through the basics. He was interested in buying a bike but not at this time. He wanted to purchase one at the beginning of the year. And I made notes saying that he will not consider financing, not even for a short time. Will pay cash in mid January or mid February. Said he is not ready to buy until then but would like to come in, bring his wife and take a look some day. Sometime today.

Q.     Do you have another note from another time?

A.     I did.  Actually, the other note was from the survey company on two different occasions.  One on the 4th and one on the 1st.  And he told them the same thing.  That he was looking to buy a [2012] to a [2014] model trike in five to six months.  And then on the second one, the same thing.  Michael will not be ready to purchase until next year.  He has already been to the dealership obtaining information.

Ms. Lewis testified that she never met Defendant's wife.

Detective Jason Little of the Rapides Parish Sheriff's Office testified that on March 14, 2014, he was assigned to investigate a missing person's report.  Detective Little received a report on a complaint made in the late-night hours of March 13, 2014.  The substance of the report, Detective Little testified, was as follows:

A.     From what I recall, Corporal Sharp contacted Mr. Worley at the Kolin substation.  Mr. Worley had contacted them once or twice prior to that, wanting to report his wife missing.  That allowed us a little bit of a time gap before they made the report.  When he made contact with Mr. Worley, in Corporal Sharp's report I believe it said that Ms. Worley, Ms. Mary Worley went to, shopping with some friends out of town.  She had left at approximately uh, let me refer back to my report.  She had left early that morning and hadn't returned at 15:00 hours, which would be 3:00, like they had discussed.

Detective Little and three other detectives went to visit Defendant at his home.  When asked why it took so many detectives to investigate a preliminary missing person's report, Detective Little replied:

A.     I had contacted Corporal Sharp that morning in reference to this case.  Corporal Sharp advised me that Mr. Worley, the night that he took the report, had made statements about already having a search party coming up from down south to start searching the Dewey Wills Management Area.  So, that kind of, something didn't seem right to me.  And I discussed it with everybody, the supervisor and everybody at the office and they kind of agreed that something, you know, let's look into it and see what it was.  So, that's why we all went.

While at Defendant's residence on March 14, 2014, Detective Little and the other detectives conducted an unrecorded interview of Defendant.  Defendant told them that at approximately 8:45 in the morning the previous day, the victim came

into the bathroom while Defendant was in the shower and told Defendant that she was leaving to go shopping in Jena. Defendant said that he asked the victim to wait so he could meet the people she was leaving with, but when he got out of the shower and dressed, the victim was gone. Defendant told detectives that he went to Sunrise Grocery to get gas and cigarettes, then returned to his residence and took his wife's vehicle to Renegade Harley Davidson. According to Defendant, he and his wife agreed earlier in the week that he would trade in her vehicle for a trike.

Defendant told the detectives that he sent a text message to his wife to tell her he was able to get the trike. Defendant purchased some clothing from Renegade Harley Davidson, then left the store and drove straight to the insurance company to get insurance on the bike. Once he paid for the insurance, Defendant returned to his residence and noticed his wife was not home. When Defendant called his wife on her cell phone, he heard the phone ringing in the bedroom. Defendant told detectives that that is when he saw his wife's cell phone and purse sitting on the bedroom dresser.

Defendant granted the detectives consent to look around the residence. One of the detectives located a Glock 9mm that was on the top shelf of an entertainment center in the living room. No other weapons were located. While outside, Detective Little noticed that Defendant's truck was muddy and appeared to have recently been driven in a muddy or dirt covered area. Through the passenger window, the detective observed two small sandy footprints on the passenger floorboard of Defendant's truck. While talking to detectives outside, Defendant said they needed to start searching the Dewey Wills Wildlife Management Area along with the side roads of the area. Detective Little testified that he found Defendant's statement to be odd and testified that he had also heard this from the initial report. He and the other

detectives, Detective Little testified, questioned why Defendant named that specific area. When asked if he questioned Defendant about this, Detective Little answered:

A. Michael stated that he had contacted Mr. Ed Trahan, who is employed with the Louisiana Department of Wildlife and Fisheries, and asked him to start searching the same area for Mary. So, I mean, that kind of didn't fit well with what was going on at the time.

Detective Little and the other detectives decided that Defendant needed to be taken in for further interview, to which Defendant consented. Once at the substation and advised of his *Miranda* rights, Defendant again recounted the events of the previous day. When detectives asked Defendant what the victim was wearing when she left that morning, he said she was wearing a camouflage jacket, a plaid shirt, brown hiking boots, and blue or black jeans. Defendant also stated that he had never met the friends with which his wife left and that she left with a white female and black male. When Detective Little got to the part where Defendant said he never saw the vehicle that his wife left in, the State asked him if Defendant gave any clue as to what type of vehicle it could have been. Detective Little replied, "No sir."

Detective Little continued to testify about Defendant's earlier description of the previous day's events. When Detective Little testified that Defendant said he returned home from Sunrise Grocery to get his wife's Trailblazer to trade in at Renegade Harley Davidson, the State asked whether Defendant said he and his wife had agreed to the trade-in. Detective Little testified that when he spoke with Defendant at the residence, Defendant said he and his wife talked about it a week or so prior and had agreed to it earlier in the week. The State made specific note of Detective Little's testimony that Defendant told them he arrived at the Renegade Harley Davidson around 10:00 a.m. According to Detective Little, Defendant said he got aggravated with how long it took for Renegade to gas up his trike. Defendant told detectives that he bought clothes for him and his wife, left to get gas, and then

went home. When the State asked Detective Little if that was different from what Defendant told him initially, Detective Little stated:

A. It's different from what he advised me earlier at the residence. Michael advised that after he dropped the clothes off he went to the insurance company to get insurance and they refused to accept his debit card.

Q. Now, did he tell you what he did next?

A. Michael stated he went to the bank, retrieved the cash and returned to the insurance company and paid for the insurance.

Detective Little testified that Defendant said he got worried when he noticed his wife was not home, so he drove to the Pineville Police Department to report her missing. Detective Little testified that the Pineville Police Department is about five or six miles, if not farther, from Defendant's residence, while the Kolin substation is less than a mile away. Defendant told detectives that he arrived at the Pineville Police Department at approximately 2:30 p.m. and was told he needed to contact the Rapides Parish Sheriff's Office since he lived outside the city limits of Pineville. Defendant said he went to the Kolin substation, where he spoke with Sergeant Jason Hagan at approximately 17:15 hours. Sergeant Hagan advised Defendant to call back if his wife had not returned by 21:00 hours.

According to Detective Little, Defendant then stated that he went to the Pineville Wal-Mart to see if the manager, Karen, had heard from his wife. Defendant said he asked Karen to page the Wal-Mart in Jena to see if his wife had been there, but they never got a response. Defendant told detectives that he returned home and called the Kolin substation when his wife did not return.

When the State asked Detective Little what Defendant said when asked why he called family members to search the Dewey Wills area, Detective Little testified that Defendant said:

22

A.      That it was just an area that he used to hunt, that he liked to hunt, that he was familiar with and he had a feeling that if something happened that she may just be there.

Defendant also told detectives that his wife was going to the Wal-Mart in Jena, so she would probably travel Highway 28 East. Detective Little agreed that Highway 28 East was the easiest route from 420 Nickel Loop, Defendant's neighborhood.

When asked if Defendant volunteered any information regarding a gun purchase, Detective Little testified that Defendant told them he bought a new Glock 9mm about a week before. Defendant stated that he bought the weapon from Alexandria Indoor Range and shot the weapon using ammo purchased at the range.

While Defendant was being interviewed, other detectives went to Renegade Harley Davidson to inquire about video surveillance and others searched the area of Highway 28 East near the Dewey Wills Management Area. While searching the side roads off of Highway 28 East in the Dewey Wills area, detectives located the body of a white female wearing a camouflage jacket, blue jeans, and brown boots. The body was located on Alligator Bayou Road, just inside LaSalle Parish, at approximately 13:58 hours on March 14, 2014.

Detective Little explained that Defendant had been brought back to his residence, so the detectives went back to the residence when the body was found. Defendant agreed to go back to the station and warrants began being processed. When asked how he would characterize Defendant's interview, Detective Little replied:

A.      Basically, based on his, the information that he gave us or his statements, the only thing I was able to get out of the interviews at that time was just some of his story had changed due to his times. From the initial report to the time I interviewed him at the residence. His time line had started getting messed up.

Defendant's recorded interview from March 14, 2014, was played for the jury.

Before his first interview at 2:45 p.m. on March 14, Defendant waived his *Miranda*

rights. Defendant told police that the night before last, he was already in bed when the victim told him she was going with friends the next morning. The next morning, the victim showered first and then Defendant showered. While Defendant was in the shower, the victim told him that her ride was there and that she was leaving. Defendant told the detectives that he asked his wife to wait five or ten minutes so that he could meet the people, but the victim said the husband of the couple was in a hurry to get to work. Defendant estimated that the victim left around 8:45 a.m. and estimated that he got out of the shower around 9:00 a.m. According to Defendant, he put on his pajamas when he got out of the shower and looked outside to see if the victim was still there. Defendant told police that he did not see the vehicle.

Defendant stated that after changing clothes and checking the list of things the victim asked him to do, he went to get gas, returned home, and then went to the Renegade Harley Davidson. According to Defendant, he went to Renegade Harley Davidson to trade-in the victim's vehicle for a trike, like the victim wanted him to do. Defendant estimated that he was at Renegade Harley Davidson around 10:00 a.m. or 11:00 a.m. and did not leave until 2:00 p.m. or 2:30 p.m. Defendant stated that he texted the victim to tell her the trade-in had gone through and that he had bought the trike. Because the insurance company would not accept his debit card, Defendant went to the bank to get cash for the insurance payment. Defendant got gas for the trike and went home.

When Defendant arrived at home, he realized his wife was still not home. Defendant tried calling the victim but realized she did not have her phone with her when he heard it ringing in the bedroom. According to Defendant, the victim had left her phone twice before, and he had to take it to her at work. Around 4:45 or 5:00, Defendant went to the Pineville Police Department, where he was instructed

to go to the substation. Defendant told detectives that he went to the substation, where he told police that it was not like his wife to be late. Defendant was instructed to return home and wait for someone to call him back to the substation. When told to do so, Defendant went back to the substation, where he filled out a report on his missing wife.

Appearing to be crying in the interview, Defendant told detectives that it was not like his wife to be late. Defendant stated that he never questioned his wife when she went to lunch with friends. According to Defendant, his wife always returned and would call if she were going to be late. Defendant stated that he and the victim had been married thirty-nine years.

Defendant told detectives that his wife said she was going to shop in Jena and would be back no later than 3:00 p.m. When the detectives asked Defendant where they should look for his wife, Defendant said the victim told him they were taking Highway 28 to Jena since the man of the couple worked off of Highway 28 East. The detectives asked Defendant what the victim said about the couple she went with. Defendant responded that the victim met the couple from "down South." Defendant remembered that the victim met the couple about a month ago while at Wal-Mart. The victim told Defendant that she first met the couple in the late 1970s or 1980s, and that seeing them was just like old times. Defendant said that he met the couple one time briefly but could not remember their names. When the police asked for a description of the couple, such as their color, Defendant stated the girl was white, and the man was black.

Defendant told police that they should start looking in the Highway 28 East area. Defendant did not know where the man worked. Defendant also stated that the victim told him the couple had moved from "down south" and were staying with

25

a friend in Alexandria. Defendant explained that he and the victim previously lived in Larose and had been living in Pineville for about three years.

Defendant told detectives that his wife had met the couple about a month earlier while working at Wal-Mart. Defendant then told police that the victim and the woman had gone to lunch a few times and that the victim had loaned the woman money. Defendant also told the detectives that the husband went to jail for assault and battery with a deadly weapon.

Defendant explained to the detectives that he had to quit hunting this past year because he needed a knee replacement. Defendant stated that he used to hunt all over Highway 28, not too far from headquarters.

After the detectives returned from leaving the interview room for about thirty minutes, one of the detectives mentioned that Defendant was not able to see the car the victim drove away in. Defendant responded that he believed the victim had seen the vehicle previously because the victim told him it reminded her of his old Ford truck. According to Defendant, he had a Ford truck back in the 1970s or early 1980s.

When one of the detectives told Defendant that they had found his wife deceased on the side of the road, Defendant appeared to be crying. The detective mentioned that Defendant's gun had been seized and that evidence was pointing to Defendant. Defendant replied that he did not do it and that a test of his gun would show that. When asked why someone would shoot his wife, Defendant said he did not know and then said she had money on her. Defendant explained that the victim had taken $300.00 from the safe before she left.

Defendant continued to periodically cry and to insist that he did not kill his wife. Defendant repeatedly told the detectives to check his gun. Defendant stated that all his wife told him about the couple was that they were from down south and that the woman was white and the man was black. The victim also told Defendant

that the woman asked her to go for a ride to drop off the husband and then go shop at Wal-Mart. Defendant agreed that the victim did not take her purse.

Defendant told the detectives that they should check the prison records because the man of the couple got out of prison three or four years ago. When the detectives asked Defendant how he could let his beautiful wife leave without knowing where she was going and who she was going with, Defendant replied that this was not the first time his wife did something like this. Defendant told detectives that his son would tell them that when they lived down south, the victim would "get something in her head" and leave with her friends.

When the detectives asked Defendant about when he went to the shooting range, Defendant insisted that he had gone the week before. The detectives showed Defendant a receipt for March 10, 2014, and Defendant stated the receipt was wrong; it was the week before. Defendant stated that he went to the range to shoot the same day he bought his gun. When the detectives suggested that the dirt found on Defendant's truck would match the dirt of the area where the victim was found, Defendant said, "Yes, I went hunting at Dewey Wills." Even though Defendant appeared to be sobbing, the detective stated there was not a tear in Defendant's eye. Defendant continued to insist that he did not kill his wife and that they needed to check his gun. When detectives asked him if he would pass a polygraph test if he took one, Defendant stated that he wanted an attorney for a polygraph test.

Defendant told the detectives that the victim liked riding bikes and told him to trade her vehicle in for a trike. Later, Defendant explained that he wanted a boat, but the victim was worried about him getting in and out of a boat with his injured leg. Thus, the victim suggested Defendant buy a trike. According to Defendant, the victim said she would drive Defendant's truck to work.

When detectives returned after leaving the room for a period of time, one of the detectives told Defendant he was concerned about a Springfield XD9. Defendant stated that he got rid of that gun last year. When the detectives asked if his sons knew who he sold the pistol to, Defendant stated that he did not think so. Defendant did not remember to whom he sold the gun to and did not do a bill of sale. Defendant told the detectives that "last year" he bought two boxes of gun ammo that is in his safe. Defendant also stated that he bought a firearm "last week." Defendant said that the only gun he has is a Glock.

When the detectives asked Defendant how he knew to tell them exactly where to look for his wife, Defendant claimed he did not tell them exactly but only told them to look on Highway 28. Defendant claimed that when he called Ed Trahan, he asked him to check the roads in the area. When asked why he did not tell them to check at the Wal-Mart in Jena, Defendant said the manager of the Pineville Wal-Mart had already called the Jena Wal-Mart.

Defendant again suggested that the couple may have wanted to rob his wife. Defendant claimed the victim took $300.00 from the safe to buy clothes from Wal-Mart in Jena. When the detectives asked again how Defendant could let his wife go off with someone he did not know, Defendant said "that's how they were." Defendant claimed the victim would have "girl's nights" when they lived down south but did not have "girl's nights" when they moved to Pineville. Later, Defendant told detectives that it was not common for the victim to leave without telling him.

When going through the events leading up to his wife's murder, Defendant again stated that the victim left around 8:45 a.m. on March 13, 2014. This time, Defendant added that he asked the victim if she was going to take her purse. According to Defendant, the victim said she was not going to take her purse or credit

28

cards; she was going to take her driver's license and cash only. Defendant stated that the victim said she wanted to show her friend the Wal-Mart in Jena because the victim liked to visit Wal-Marts in different towns. Defendant told detectives that the victim would go off "like this" about three times a year.

Defendant also added that between leaving Renegade Harley Davidson and going to get insurance, he went home to drop off the clothes he bought at Renegade Harley Davidson. Defendant claimed he went to the insurance agency next, but they would not take his debit card, so he had to go to the bank to get cash. According to Defendant, he got gas and went home.

Defendant told detectives that he knew Mr. Trahan from hunting at Dewey Wills. Defendant agreed that the extent of his search had been going to Pineville Police Department, going to the substation, going home, and then calling Mr. Trahan. Thereafter, Defendant added that he went to the Wal-Mart in Pineville to talk with the victim's co-workers as to whether they knew who the victim was with.

According to Defendant, one of the tasks on the victim's "to do" list was for Defendant to buy her a pistol to keep at home when Defendant was gone. When asked if he knew of anyone the victim may have been having problems with, Defendant said he did not know but did know that someone called the victim at Wal-Mart to harass her.

When the detectives asked Defendant why he told someone that he knew the victim did not make it to Wal-Mart, Defendant stated that he went to Wal-Mart to talk with the victim's manager. Later in the statement, Defendant said that the Sheriff's office in Pineville suggested someone at the victim's work may know something. Defendant explained that the manager called the Jena Wal-Mart to see if the victim made it there. Defendant again denied telling the police to look in the

29

Dewey Wills area. Rather, Defendant claimed he told them to look on Highway 28. Later, when asked why he thought of Dewey Wills as a place to look for the victim, Defendant stated he guessed he watched too much television. Defendant repeated that the victim told him they were going to take Highway 28 to Jena; thus, Defendant said they were going to pass Dewey Wills.

Defendant told the detectives that he went to the shooting range the previous Monday to shoot a Glock 9mm. Defendant said that the Springfield he previously owned was also a 9mm. According to Defendant, he previously owned a Springfield 45, 40, and 9. Defendant claimed he sold the Springfield 45 to a guy in Galliano that owned a pawn shop. The Springfield 9, Defendant stated, was sold about a year before to a friend of Johnny Crosby. According to Defendant, Mr. Crosby lived in Cut-Off.

Trying to recall the woman with whom the victim left, Defendant said it may be a woman named either Katie or Kathy. Defendant repeated that the victim went out to eat with the woman and that the woman owed the victim $40.00.

Finally, when detectives told Defendant that the shell casing found near the victim's body was consistent with the Glock he purchased, Defendant said they were wrong. Defendant stated the gun had been fired only once at the firing range. Defendant guaranteed that the shell casing would not match his gun.

The following day, Saturday, March 15, 2014, Detective Little requested to look at video surveillance at Sunrise Grocery, the store Defendant stated he visited the morning of the day his wife left. According to Detective Little, it takes approximately two minutes to travel from Defendant's residence to Sunrise Grocery. Detective Little described the video as follows:

> A. In the video we saw Mr. Worley pull up to the gas pumps. And you could see him exit his white truck and open up the gas lid to the gas tank. It appears that Michael looks around to see if the clerk is looking

30

and then reaches into the bed of his pickup truck and removes a black shoe and places it into the trash can near the gas pumps.

Q.    And can you see him kind of shove it down in there a little bit?

A.    Yes sir.  It appears that Michael attempts to push the shoe towards the bottom of the trash can to conceal it from being seen.

Detective Little testified that when he saw this video, he suspected the shoe contained evidence that Defendant was attempting to get rid of.  The clerk advised Detective Little that the dumpster had not been emptied, so the detectives went digging in the dumpster.  In a trash bag, one of the detectives found a right-footed black Nike tennis shoe covered in mud.  According to Detective Little, the timestamp on the surveillance video was one day and thirteen hours off.  The surveillance video and still pictures from the Sunrise Grocery were admitted into evidence as State's Exhibits 29 and 30, respectively.  Detective Little answered questions regarding the video as it was played for the jury.  Detective Little also noticed that the video from Renegade Harley Davidson showed Defendant wearing different clothing than the clothes he was wearing in the Sunrise Grocery video.

Detective Little testified that he noticed from his previous observation of Defendant that he had a special sole on his left shoe.  During one of his interviews, Defendant said the victim had thrown the shoe away a couple of weeks before because the soles were worn out.  While detectives attempted to locate the left shoe at Defendant's residence, Detective Little asked Defendant's neighbors if they had any type of video surveillance.  Finding one of the neighbors had video surveillance, Detective Little took the video to the substation to review it.  Detective Little testified as to the images seen on the video the day of the murder:

A.    On March 13, 2014 at 5:15 hours you can see the back porch light turn on.  At 8:10 hours it appears that Michael walks out to the mailbox at the end of the driveway.  At 8:32 hours you can see Mr. Worley's white GMC truck leave the residence.  At 10:29 hours Mr. Worley's white GMC truck returns to the residence.

31

Q. Now, I'm going to stop you right there. You watched this video consecutively between 8:32 hours and 10:29 hours?

A. Yes sir.

Q. Okay. And did – between 8:32 and 10:29 did any vehicles leave or return to the residence?

A. No sir.

Q. Okay. Prior to 8:32, on that day, did any vehicles arrive at the residence?

A. No sir.

Q. Did any vehicles leave the residence?

A. No sir.

Q. And from that point what was observed on that video?

A. At 10:33 hours you can see someone moving around the backyard and under the carport. At 10:56 hours you can see some type of movement underneath the carport.

Q. And that was interpreted as someone getting in a vehicle?

A. Correct. At 10:58 hours you see Mary's tan SUV leave the residence. At 14:42 hours you can see Mr. Worley return on the trike. And at 3:35 you can see Mr. Worley leaves the residence on the trike.

When Detective Little compared the timestamp on the video to the time on his cell phone, the times were within minutes of each other "[i]f not directly on the right time." The parties entered into the following stipulation regarding the above video surveillance:

MR. KENDRICK: The Stipulation is as follows, it's a Joint Stipulation. It's signed by Mr. Hickman and myself. It has the Caption of the case. It's titled Joint Stipulation #3, Donny Raby video. And it says that the parties stipulate as follows: Video secured by RPSO, which is Rapides Parish Sheriff's Office, from the Donny Raby residence on Nickel Loop, reflects the following activity on 320 Nickel Loop on March 13, 2014 between 5:15 a.m. and 3:35 p.m. At 5:15 a.m. back porch light turns on. 8:10 a.m. person walks to mailbox. 8:32 a.m. white pickup truck leaves carport located upon 320 Nickel Loop. 10:29 a.m. white pickup truck returns to carport located upon 320 Nickel Loop. 10:33 a.m. person moves around backyard/under carport.

> 10:58 a.m. tan Trailblazer leaves carport located upon 320 Nickel Loop. 2:45 p.m. person riding trike (three-wheeled motorcycle) returns to residence, and that is 320 Nickel Loop. It doesn't say 320 Nickel Loop but that's synonymous. 3:35 p.m. person riding trike leaves residence. Again, that's 320 Nickel Loop. So, those are the times that are reflected in the Stipulation. The Stipulation goes on to say, the video continuously records between 5:15 a.m. and 3:35 p.m. on March 13, 2014. No other activity is reflected on said video. And then the stipulation goes on to say that the video is unable to detect activity north of 320 Nickel Loop during the times listed.

The Nickel Loop surveillance video was introduced as State's Exhibits 27 and 28 and was played for the jury.

In Defendant's recorded interview on March 15, 2014, Defendant repeated the events leading up to the victim's disappearance. When Defendant got to the part where he got gas and cigarettes around 10:00 a.m., Defendant said, "That's where the shoe part comes in." Defendant told detectives that there was an old Reebok shoe in a bucket in the back of his truck. Defendant stated that he threw the shoe away at the gas station and that his wife had thrown the other one away about a week ago. Defendant claimed he threw the shoes away because the sole popped out. When the detectives mentioned that Defendant changed clothes between getting gas and going to Renegade Harley Davidson, Defendant stated that he put on clothes to get gas, then went home and changed to go to Renegade Harley Davidson. Defendant stated that he then went to Renegade Harley Davidson, where he bought the trike, shirts, and other things.

For the first time, Defendant stated that his black neighbor, Walter Ray Williams, walked over, and Defendant told him what was going on with the victim. Defendant said that Walter reminded him that they had talked about "those people" that the victim left with awhile back. Later, Defendant stated that the people Walter said he and Defendant talked about was the woman and "that guy." Defendant stated that he and Walter had talked about the man and woman about two months ago.

33

According to Defendant, Walter told him that Defendant's wife trusted too many people.

Defendant told police that he smoked Marlboro Special Blend. When asked what he would say if video surveillance in his neighborhood showed him leaving his house earlier than he said and also showed no other vehicles going to his home, Defendant just kept shaking his head and saying, "No." Defendant kept insisting that the video was wrong but eventually conceded that he guessed he left a little earlier.

In the interview on the previous day, Defendant told police that his computer was destroyed because it kept having problems. In the interview on March 15, 2014, Defendant stated the computer busted about three weeks ago. Although Defendant stated that he had looked at bikes, he denied having tried to buy one. Defendant admitted to looking at bikes on his computer but denied sending emails back and forth with a representative from Renegade Harley Davidson, at least as far as he could remember.

As for the clothes he bought at Renegade Harley Davidson, the detectives asked why he bought small-sized clothes when his wife wore a large. Defendant said the victim wore small-sized clothes at one time but now wears large. Defendant denied buying the small-sized clothes recently and claimed that he bought them long ago.

When police asked Defendant what he would say if his DNA was found on a cigarette butt at the scene, Defendant said, "I don't know. I threw it out or something I guess." Defendant claimed he did not know where the victim was found.

Returning to the subject of his gun, Defendant stated that the gun found at his house, a Glock 9, was purchased the previous Monday. Defendant acknowledged that he originally told detectives that he purchased the Glock the previous Friday but

subsequently realized that it was the previous Monday. Defendant claimed he got rid of his Springfield XD9 the previous year but did not remember who he sold it to. When police asked Defendant what he would say if they told him they have the Springfield XD9 in custody, Defendant said that they had the guy. Defendant denied that he was that guy. When detectives asked Defendant how he knew it was a Springfield that killed his wife, Defendant said that he did not know before the police told him. Defendant said that the gun used to kill his wife would not be linked back to him. Defendant claimed again that he got rid of the Springfield last year and bought a new gun the previous Monday. Defendant denied that he always went to the shooting range to shoot.

Even though Defendant said he cried all day the previous day, the detectives accused Defendant of having no tears. Defendant reiterated that he did not kill his wife and that he would take a polygraph test. When the "XD9 pistol" was brought up again, Defendant said he sold it to a friend of one of his buddies. The guy had a Cajun name, Defendant remembered, and thought it might be "Gaston." Defendant stated that he thought the gun was in Chauvin. When the detectives said Defendant previously told them the gun was in "Cut-Off," Defendant said he wanted them to find evidence. When the detectives again asked Defendant where the XD9 pistol was, Defendant answered, "[Chauvin] I guess." When the detectives again stated that Defendant said "Cut-Off" the previous day, Defendant said that the guy was from Chauvin. Defendant stated that he did not remember the guy's name but remembered it was a Cajun name. When the detectives asked Defendant if the guy he sold his gun to killed his wife, Defendant answered, "I guess. Maybe he sold it to someone else. I don't know." The detectives once again asked Defendant where the Springfield XD9 was, and Defendant stated that the guy was from Chauvin. When the detectives asked, "So, he's the one that killed your wife[,]" Defendant

responded, "If he still has it I guess." The detectives told Defendant that he was pretty adamant that the Springfield was the gun used to kill his wife. Defendant stated that the detectives said that, not him.

Finally, detectives asked Defendant about a $3,000 transfer he made from his savings account. Defendant claimed he transferred the money to pay for the insurance and to pay bills. When detectives reminded Defendant that he told them his wife paid the bills, Defendant stated that his wife was not there anymore. When detectives noted that his wife was not missing when he made the transfer, Defendant stated the victim told him they needed the money to pay bills. Defendant repeated that he would take a polygraph.

On Monday, March 16, 2014, Detective Little and another detective watched video received from Sunrise Grocery. Detective Little described what he saw on the video:

A. Yes sir. I did. After watching the video we discovered that Michael pumped his gas. Then walked around to the front of his vehicle, to the front of his vehicle to the passenger's side and removed a second black shoe. The video shows Michael reaching into the bed of the truck from the passenger's side, removing the shoe, and placing it into a trash can closest, near the store.

Q. You did not realize this earlier. Yes?

A. No sir. I did not.

Q. And what's kind of the reason for missing it earlier?

A. When we were reviewed [sic] the video originally the clerk had changed the cameras from the first shoe that we saw him put in the trash can to the inside video where it showed the actual transaction.

Q. Right. And so, just basically, it was kind of an initial look rather than kind of the thorough going back into the investigation?

A. Correct.

Q. Okay. So, you saw this and then had the idea, hey, there may be another shoe. And based on that what did you do?

A.    Drove to Sunrise Grocery.  Myself and Detective Mims then drove to Sunrise Grocery and discovered that shoe was still in the same trash can that it was placed in.

Q.    And you personally observed the shoe?

A.    Correct.

Q.    Okay.  How would you describe the shoe?

A.    Just in the trash can.  There was a couple of items on top of it. The shoe was just laying in the trash can.  Also, that shoe had a special sole on it.

Q.    Now, this is a different shoe with a special sole than you had seen the day prior whenever you were talking to Mr. Worley?

A.    Correct.

Detective Little testified that on March 17, 2014, two other detectives began viewing video from the Outpost Store, which is located on Highway 28 East, in Deville.  Although Detective Little acknowledged that a positive identification of Defendant's truck cannot be made from the Outpost Store's video, he testified that the video shows what is believed to be Defendant's truck passing the store eastbound and then back westbound.  Detective Little estimated that it takes about twenty minutes to drive from Defendant's residence to the Outpost Store.  Detective Little also estimated that it takes about ten minutes to travel from the Outpost Store to Alligator Bayou.

Detective Little identified State's Exhibit 26 as an "ATF" form showing Defendant purchased a Glock 19 in February 2009.  Detective Little testified that this gun was never recovered from Defendant, and he has no record of Defendant getting rid of the gun.

On cross-examination, Detective Little acknowledged that Defendant told them in his interview that he had gotten rid of the Glock firearm prior to his wife's death.  Detective Little testified that he has no evidence to contradict Defendant's

assertion. Although a dealer must fill out forms when it transfers a firearm to an individual, no forms are required when an individual transfers the firearm to another individual. When asked if he had any evidence to show that this particular firearm was used in a crime or in this crime in particular, Detective Little responded, "No sir." Thus, Detective Little acknowledged that even if he found the firearm previously owned by Defendant, the firearm may or may not have been the gun that killed the victim.

Detective Little acknowledged that he did not contact the Jena Police Department or LaSalle Police Department to ask them to search the Jena Wal-Mart or other stores for the victim. When asked if he had any idea whether the victim actually made it to Jena, Detective Little stated he believed that later in the investigation Wal-Mart personnel in Jena were contacted to see if anyone matching the victim's description had been in the store. Detective Little testified that no other stores were contacted. Detective Little also testified that he did not look for the couple with whom Defendant stated the victim left. Additionally, Detective Little did not check with businesses around Jena or Jonesville to see if anyone of their employees came in around the time the man of the couple was supposedly dropped off at work. Detective Little admitted that when he initially spoke with Defendant, he suspected Defendant as being involved in the victim's disappearance.

When defense counsel asked Detective Little if the basis of Defendant's story remained the same even though some of the times changed, Detective Little testified:

A.    Somewhat.

Q.    A mixed-race couple picked up his wife that morning. They supposedly went to Jena. Left somewhere between 8 or 8:45 somewhere in the morning. Right?

A.    Yes sir.

Q.    They were supposed to be back about 3:00.

38

A. Yes sir.

Q. They never returned.

A. Correct.

Q. He don't [sic] know who the couple was.

A. Correct.

Q. Didn't see them.

A. Correct.

Q. Didn't see the car leave.

A. Correct.

Q. Those facts remained the same throughout the entire six or seven hours that y'all questioned him. That remained the same didn't it?

A. Yes sir.

Q. Okay. And as far as you know that hasn't changed even up to today.

A. There were a few things that changed. According to the initial report that Corporal Sharp took that morning, the initial report stated that Mr. Worley told Corporal Sharp, and it's noted in the report, that his wife went missing around 09:45 hours that morning.

Q. Okay. So, again, we're talking about a time thing.

A. Yes sir.

When defense counsel asked if there were several white trucks that passed back and forth in the Outpost Store's video, Detective Little replied, "Yes sir. I believe so." Detective Little again testified that he could not say for sure if the white truck suggested to be Defendant's truck in the Outpost Store's video was, in fact, Defendant's truck.

After defense counsel questioned Detective Little as to why he thought it strange that Defendant claimed to have already called a search party, Detective Little agreed that the Pineville Police Department told Defendant that the victim's

disappearance was not in its jurisdiction and was then told at the Kolin substation that she had not been missing long enough. Detective Little agreed that he would have personally started looking for his wife that early and would call on other folks to look if he had a general idea of where she could be. Defense counsel then asked Detective Little questions suggesting that since Defendant said the victim took Highway 28 to Jena, there was a general idea of the areas to be searched.

As for throwing the shoes away at the Sunrise Grocery store, defense counsel questioned Detective Little as to why it was not logical for Defendant to throw the shoes in different trashcans. Detective Little agreed that Defendant retrieved the first shoe from the driver's side and threw it in the trash. Detective Little also agreed that when Defendant finished pumping gas, he walked around to the other side of his vehicle, retrieved the other shoe, and threw it in a trash can on the right side of his truck. The following colloquy then took place:

> Q.    Would it make sense for him to pick up the shoe from the left side and walk back around to the driver's side and put it in that trash can when there's one right there?
>
> A.    I mean, if you throw one shoe away in one trash can why not throw the other one away? Some homeless man may need them.
>
> Q.    Well, he wasn't thinking about it. According to him he said the soles wasn't working.
>
> A.    Excuse me, sir?
>
> Q.    According to him the soles – how's a homeless man going to wear shoes specifically made for him?
>
> A.    Some people need shoes.
>
> Q.    Okay. But to him it was trash.
>
> A.    Okay.
>
> Q.    Okay. He threw it in the trash can right here. He threw it in the trash.
>
> A.    Yes sir.

Q. Trash can right there. He threw that one in the trash.

A. Yes sir.

Q. Is that unusual?

A. I mean, I guess I've done it. Thrown something in one trash can and something in another.

Finally, defense counsel asked Detective Little if he was aware of any evidence other than the inconsistencies in Defendant's story that tied Defendant to the murder of his wife. Detective Little replied, "Yes sir . . . [t]he video from Nickel Loop." Detective Little explained that the video showed no one arriving at the residence to pick up his wife when Defendant said she left. Detective Little acknowledged that the video did not show the entire neighborhood. After pointing to some areas that Detective Little agreed could not be seen on the video, the following colloquy took place:

Q. Okay. So, if, let's say if a vehicle had parked there and blew their horn or whatever for Ms. Worley. There's no way you could see whether or not that vehicle was there or not. Could you?

A. No sir.

Q. You couldn't see it coming or leaving could you?

A. No sir.

Q. Okay. So, the fact that you don't see a vehicle on that video, coming or leaving, doesn't necessarily mean that there wasn't a vehicle that came and left?

A. Correct.

Finally, Detective Little testified that Defendant's claim that he texted his wife from the Harley Davidson store and the claim that he called her when he got home were both verified.

On re-direct, Detective Little testified as to the businesses, residential areas, and other wooded areas along Highway 28 on the route to Jena. According to

41

Detective Little, one traveling down Highway 28 would pass a few small stores and then a residential/rural area for seven to ten minutes before getting to the Dewey Wills Wildlife Management Area. After passing the Diversion Canal on Highway 28, Detective Little testified that it takes about fifteen to twenty minutes before turning left onto Highway 84 towards Jena. That portion of the drive on Highway 28, Detective Little explained, is "pretty desolate . . . [w]ooded with few residences toward Highway 84." After taking a left onto Highway 28, Detective Little further explained, there is another twenty to twenty-five minutes of rural residential communities and businesses before getting to Jena. When asked why the Rapides Parish detectives decided to look in Dewey Wills considering all of the places between the Worley household and Jena, Detective Little responded: "Because that was the information provided to us by Mr. Worley. That, that's where we needed to start looking."

As for defense counsel's theory that the video surveillance of Defendant's neighborhood may not have captured the victim being picked up the morning in question, the following colloquy took place:

> Q. Mr. Hickman asked you a question about this theory. And I guess it has to be the only theory, which is that there was a vehicle that was parked a little bit to the north and that the suggestion is, that vehicle parked to the north and Mary Worley must have walked outside that house to get into that vehicle which you couldn't see in the video. Do you kind of agree with that characterization of that line of questioning?
>
> A. Yes sir.
>
> Q. How do you know that, that's not true?
>
> A. Because within the video you can see movement under the carport. Down the driveway. I mean, all the other movement. You can see movement within the yard of 320 Nickel Loop.
>
> Q. And was there any – in the video was there any person moving in any of these relevant times? From early in the morning whenever he got up and fixed his coffee and turned the light on. Well, let's just say

42

whenever the light comes on in the morning until say, 3:30 in the afternoon. Anybody walking except as we noted in the stipulation?

A. No sir.

Q. And if there had been that video would see it. Yes?

A. Correct.

. . . .

Q. So, given your observations, which observation is supported by the stipulation of literally what appears on that video. Is it possible that Mary Worley did what Mr. Hickman suggested to you a minute ago, which is walked out the house [sic] to an area that you couldn't see, where she was picked up by a car that you can't see and then driven to Jena and murdered from there? Is that possible?

A. No sir.

The State recounted the stipulation as to the events recorded by the video surveillance, specifically noting that a white pickup left at 8:32 and returned at 10:29 a.m., almost two hours later. To Detective Little's knowledge, Defendant had not offered an explanation that reconciled this two-hour lapse with his statement that he left to get gas and returned home. Finally, Detective Little testified that considering how upset Defendant claimed to be about his wife not returning home, he offered no explanation as to how he was able to stop and get gas and make a withdrawal at the bank before reporting her missing at the Pineville Police Department.

The next witness, Ikeisha Rena Logan Jones, lived on Nickel Loop. Mrs. Jones did not know the victim but did have conversations with Defendant. Mrs. Jones testified that Defendant never expressed any concerns about his wife hanging around a mixed-race couple and never told her that his wife had a friend who had just gotten out of prison for a violent crime. Mrs. Jones testified that she could see the front of the Worley house from her front door and never saw a mixed-race couple at the Worley residence. On the day the victim was killed, Thursday, March 13, 2014, Mrs. Jones testified that she left home about 10:00 a.m.

Mrs. Jones did not see the victim get into any vehicle. On cross-examination, Mrs. Jones testified that on the morning the victim was killed, she was inside her home, getting her kids ready for school and then cleaning up the house; she was not watching the Worley residence. Finally, Mrs. Jones testified that she was Defendant's neighbor but did not have a relationship with him and did not discuss personal stuff such as his wife or her friendships.

Mrs. Jones' husband, Eric, testified that their house does not have windows facing the Worley residence, but the residence can be seen from their front yard. Mr. Jones testified that he was friendly with Defendant and had a beer with him every now and then. Mr. Jones did not see the victim much and never knew her to have friends over to visit. As for the morning of the murder, Mr. Jones did not notice any "comings and goings" or anything unusual at the Worley residence. Mr. Jones testified that he was not aware of the victim having a friendship with a mixed-race couple and did not ever warn Defendant about any couple that meets that description. Finally, Mr. Jones was not present when Mr. Williams supposedly warned Defendant about such a couple. On cross-examination, Mr. Jones testified that he normally leaves for work at 7:30 a.m.

The next witness, Walter Ray Williams, testified that he knew the victim and that he lived across the road from her. As for his interactions with Defendant, Mr. Williams testified as follows:

Q. You ever have the occasion to chit chat with Mr. Worley?

A. Many times.

Q. Did you ever give him any warnings about a black man and a white woman that Ms. Mary was associated with?

A. Never seen them.

Q. Sir?

A. Never seen them.

Q. So, that's actually a better question. Have you ever seen a black man and a white woman over at their house?

A. Never seen them.

Q. You ever known one to be at their house?

A. Never.

Q. Mr. Worley ever told you anything – I'm going to get my question out so that I can make sure that I can understand your answer. Did Mr. Worley ever say, told you that he was worried about any friends that Ms. Mary was associated with?

A. No.

Q. Did he ever say specifically there's a guy who, a guy that just got out of prison. I'm kind of worried about my wife associating with him? Anything like that?

A. He said that afterward.

Q. I'll get there in a second. But before Ms. Mary was killed did he ever say that to you?

A. No.

Q. And could you have ever said anything to him that he thought that you were saying anything like that?

A. No.

Q. Did you ever tell Mr. Worley he shouldn't be so trusting of people around his wife?

A. No.

Mr. Williams testified that the victim was a wonderful, hard-working woman. On cross-examination, Mr. Williams stated that he had been working a nightshift on the day the victim went missing, so he went to bed around 8:30 or 9:00 that morning. Mr. Williams agreed that he was not watching the Worley's home at any time that morning. Finally, on re-direct, Mr. Williams stated that he had never seen the victim walk to the end of the street and get in the car with someone.

Another neighbor of the Worley's, Amanda Baham, testified that she spoke with Defendant a few times, and he never expressed concern about any of his wife's friends. At the time of the murder, Ms. Baham was a student at Pineville High. Ms. Baham also testified that Defendant never spoke to her about a mixed-race couple that his wife was associating with, and Ms. Baham never saw a mixed-raced couple at the Worley residence. When Ms. Baham saw the victim outside watering plants, Ms. Baham would wave, but Ms. Baham never spoke with the victim about her friendship with a mixed-race couple. According to Ms. Baham, the victim never talked to her about reassociating with some friends that had just moved up from down south. On cross-examination, Ms. Baham testified that she was at school during the day, so she would not have seen if someone picked the victim up during the day. Finally, Ms. Baham testified that she was not close friends with the victim and that she did not share a natural bond with either the victim or Defendant.

Rick Lofton, a detective with the Rapides Parish Sheriff's Office, assisted Detective Little in trying to locate the victim. Detective Lofton went to Defendant's residence, where he spoke with Defendant's sons. The sons told Detective Lofton that they drove over when Defendant called to tell them their mom was missing. According to the sons, Defendant said he believed the victim was missing in the Dewey Wills Management Wildlife Area.

Detective Lofton also went to the victim's work, Wal-Mart, where he spoke with the manager. When asked if the victim had shown up for work, the manager said that she was scheduled to work but had not shown up, which was unusual. The manager told the detective that Defendant had called her to tell her the victim was missing. Detective Lofton then went to Renegade Harley Davidson where he met with the service manager and made sure the victim's Trailblazer would not be washed or sold. The service manager later called Detective Lofton to tell him the

Trailblazer had already been sold to Paw Paw's Used Cars in Alexandria. Detective Lofton located the Trailblazer and secured it for the crime scene detectives. Detective Lofton went back to Renegade Harley Davidson, where he viewed video surveillance of Defendant walking around the store and shopping. When Detective Lofton returned later to collect the video into evidence, he saw additional footage of Defendant walking around the store. Detective Lofton testified that the video showed Defendant on the second floor with a black male and white female behind him. Detective Lofton also obtained emails where Defendant contacted Renegade about purchasing a trike.

Detective Lofton also talked to Ed Trahan, a wildlife agent, who said Defendant told him he believed his wife was missing in the Dewey Wills Wildlife Management Area.

After receiving a call that a female's body had been found, Detective Lofton went to the scene. When Detective Lofton visited the scene a second time the following day (March 15, 2014), he found and collected for evidence some cigarette butts that he knew to be the same brand smoked by Defendant. According to Detective Lofton, the butts were not close to the body but were on the "road area" of Alligator Bayou Road. Since there were several butts in an area, Detective Lofton testified that it looked like someone may have been sitting in a vehicle and dropped the cigarettes from the window.

Detective Lofton testified that he began going to different convenience stores along the route between the crime scene and Defendant's residence. Detective Lofton went with Detective Little and Captain Brister to Sunrise Grocery, where they viewed the video showing Defendant discarding the shoe. The shoe, found in a clear plastic garbage bag located in a dumpster, was photographed and collected into evidence. Detective Lofton identified State's Exhibit 23, which was labeled

"one black tennis shoe with mud on bottom of the shoe found in trash bag in dumpster." According to the detective, the shoe he found had a normal sole.

On March 17, 2014, Detective Lofton went to the Outpost Store, which was a convenience store along the route between Defendant's house and the crime scene. The detective testified that he was looking for any evidence of a vehicle fitting the description that Defendant gave of the vehicle his wife may have left in. According to Detective Lofton, a security video recorded from the Outpost Store on March 13 showed "a white Chevrolet truck, fitting almost the same description of Mr. Worley's truck" passed by the Outpost Store around 8:47 a.m. When asked what direction the vehicle was travelling, Detective Lofton replied:

A. It was headed east and the vehicle was very clean in the video. You could tell it was clean. It had no dirt on it or anything like that. It appeared that you could see the passenger side, it looked like there was a silhouette in that window of the vehicle when it passed by. I couldn't see the driver's side. But I could see a silhouette in that passenger window, in the video as the truck drove by.

When asked if he saw a white truck coming back the other way, Detective Lofton testified:

A. Yes sir, I did. About 10:09 a.m. that same day. I saw a truck that was identical to the truck that I saw the first time, which was also identical to Mr. Worley's truck, pass back by. But this truck you could tell, had mud on the tires and a little mud on the back fender. You could barely see that. I couldn't see into the cab of the truck at the angle when it was passing by going west on 28 East.

According to Detective Lofton, the times he testified to were obtained from the video itself. Detective Lofton further testified that those times were compared to "real-time" as they were watching the video to make sure the times were in sync and, he testified, they were. According to Detective Lofton, it was approximately five miles between Defendant's residence and the Outpost Store. The Outpost Store's video was admitted into evidence as State's Exhibit 31 and published to the jury as Detective Lofton testified regarding the images shown. Detective Lofton

48

acknowledged that other white pickup trucks were shown in the video. When the truck associated with Defendant came into view, the following colloquy took place:

Q.    I'm going to stop it there. You've seen Mr. Worley's personal vehicle?

A.    Yes sir.

Q.    And we have pictures. And the jury can see the pictures of that vehicle.

A.    Yes sir.

Q.    But your own analysis, recollection, is that it's similar to the truck which is passing here?

A.    Yes sir. Because Mr. Worley's truck is a single cab white Chevrolet truck.[1] And he has chrome nerf bars on his vehicle. And in the moving part of the video you can see the chrome nerf bars on the vehicle.

Detective Lofton explained that chrome nerf bars are "like a step" at the bottom of the door. Detective Lofton also testified that something, possibly a pole, was sticking out of the back of the tailgate.

When asked if any effort was made to find the gun used to kill the victim, Detective Lofton testified that the ponds near the victim's body were drained, divers searched the area, the septic tank behind Defendant's house was drained, and metal detectors were utilized. According to Detective Lofton, no gun was found.

On cross-examination, Detective Lofton testified that he did not look for the victim in Jena nor did he look for the mixed-race couple. Additionally, Detective Lofton did not request the store videos from the Wal-Mart in Jena. As for the truck in the Outpost Store's video, Detective Lofton testified that he was sure it was a GMC, like Defendant's truck. When asked if he saw a GMC emblem on the truck in the video, Detective Lofton stated that he did not but could tell it was a GMC by

_____

[1] Detective Lofton later clarified that Mr. Worley's vehicle is a GMC and that the vehicle he saw in the video he also believed to be a GMC, not a Chevrolet.

the grill on the front of the truck. Detective Lofton did not know if Defendant's truck had a GMC emblem on it. When asked if there was anything besides being a white GMC pickup truck that he could say about Defendant's truck, Detective Lofton stated "[i]t had chrome nerf bars at the bottom part of the doors on the truck." Detective Lofton testified that he did not know how many white GMC pickup trucks with chrome nerf bars there were in Rapides, LaSalle, or Catahoula parishes. The following colloquy ensued:

Q. From this video were you able to detect the tag number on the vehicle that you saw passing by that morning?

A. No.

Q. Okay. So, were you able to tell who was in the vehicle as it passed by?

A. No.

Q. So, as we sit here right now, the only thing you can tell us about this truck is that it was what appeared to be a white GMC pickup truck with chrome nerf bars on it. Is that right?

A. It was a single cab.

Q. Single cab.

A. White GMC truck with chrome nerf bars.

Q. Okay. And do you know how many of those are in those three parishes I just told you about?

A. No.

Q. Okay. So you can't honestly say that, that was Mr. Worley's truck [that] passed by that morning. Could you?

A. After I looked at other video that we found from Sunrise Grocery, when I saw the truck pass back by I could say that was his truck.

Q. You're one hundred percent positive that was his truck?

A. Yes.

Q. You couldn't notice the tag number on it.

50

A.    No.

Q.    You didn't see who was driving the truck.

A.    No.

Q.    Didn't see who the passenger was that you say you saw in the video. Did you?

A.    No. But you could tell by the mud that was on the tires, when he passed by going back toward the Pineville area, to the mud that was on the tires, they were almost exact.

According to Detective Lofton, the same red mud ring was on the truck in the video and still photos of Defendant's truck at Sunrise Grocery. Detective Lofton acknowledged that one of the reasons he picked out the truck he did in the video was because it passed by in the time frame he was looking for. When asked what made him think the truck that passed back by was the same truck, Detective Loftin testified that it looked identical except it had mud on the tires. According to the detective, there were many other white trucks that passed by at that time that looked nothing like Defendant's truck.

The following items were entered into evidence by stipulation:

- The victim's driver's license – recovered from the victim's body on Alligator Bayou Road in LaSalle Parish.

- A Glock holster recovered from the Worley residence in a search warrant on March 14, 2014.

- A gold watch recovered from the victim's body.

- Three rings recovered from the victim's body at the crime scene.

- Three Glock magazines and one Case EI 9mm magazine for a Glock 19 recovered from the Worley residence on March 21, 2014.

- A Case EI 9mm magazine for a Glock 19 recovered from the Worley residence on March 21, 2014.

- Paperwork of purchase of Harley Davidson motorcycle by Defendant.

51

- A "To Do" list recovered from the Worley residence on March 14, 2014.

- Receipts recovered from the Worley residence on March 13, 2014. There are four Capital One Bank receipts – a checking balance inquiry on March 13, 2014, at 11:25 a.m.; a savings balance inquiry on March 13, 2014, at 11:20 a.m.; a $3,000 transfer on March 13, 2014, at 11:21; and a $1336.00 withdrawal on March 13, 2014, at 4:01 p.m. There is also a receipt for what appears to be gas.

- Receipts recovered from the Worley residence in March 2014 [sic].

- Receipt from Renegade Harley.

- Two Glock magazine loaders recovered on March 21, 2014.

- Sticky note retrieved from Worley residence on March 14, 2014.

- A 9mm casing found on March 14, 2014, on Alligator Bayou Road next to the body.

- Thermal underwear.

- Black Nike left shoe recovered on March 18, 2014 by Detective Mims.

- Black tennis shoe initially found by Detective Lofton on March 15, 2014.

- Blue Harley Davidson shirt recovered from master bedroom men's closet on March 15, 2014.

- A dark brown/black purse with miscellaneous items.

- Several photographs taken during search warrants.

The State and Defendant entered an additional stipulation to the following:

- The DNA on the cigarette butts recovered by Detective Lofton was no match for Defendant.

- The soil sample from the shoes recovered near Sunrise is not a match to the soil sample recovered from near the victim's body.

- The soil sample from Defendant's truck was similar to the soil sample recovered from the dirt road near the victim's body.

- That Defendant often hunted on the Dewey Wills Wildlife Management Area.

- The Glock 9mm gun recovered from Defendant's home is not a match to the bullet recovered from the victim's body.

- Stipulation as to the victim's and Defendant's cell phone numbers.

Richard Smith, a detective with the LaSalle Parish Sheriff's Office, testified that his office received a call on March 14, 2014, that a deceased female was found in LaSalle Parish, and it was believed that the female was the victim. Detective Smith testified that the road leading to the victim's body was a dirt/gravel road, and the victim's body was lying between two ponds on a grassy knoll. There were mud holes between the area where a person could park and where the victim's body was found. Detective Smith identified State's Exhibit 35 as photographs of the crime scene. Detective Smith testified that the victim's driver's license was in her rear back pocket. Notably, Detective Smith testified that the victim's hands were still in the pockets of her jacket. Additionally, Detective Smith testified that the victim was clothed in her jacket and warm clothing. When asked if he made any observations about the victim's manner of dress, Detective Smith testified that it appeared she was dressed for the weather at that time of the year. The boots the victim was wearing, Detective Smith opined, were for walking or hiking. Finally, Detective Smith testified that the victim's "rings and stuff" were removed prior to the autopsy and testified that there were no wounds on the victim's hands.

Joshua Newcomb, a detective with the Rapides Parish Sheriff's Department, was asked to look at a receipt that had already been introduced into evidence. When asked to explain the exhibit, Detective Newcomb testified:

A. A Glock 19 Gen 4. It's going to be a fourth generation Glock import. Glock started back in 2010 from the previous Gen 3 which was discontinued around 2009. A B27B target is a common silhouette target used for target practice. The fire lane rental indicates, it looks like a discount for purchasing a pistol at the range. Hearing protection. Federal RTP 9mm. It's a full metal jacket ammo. RTP is for range target and practice.

Since the State did not identify the exhibit, it is not clear what Detective Newcomb was describing; however, we find that it appears the detective was describing the receipt for Defendant's purchase of a Glock 9mm the Monday before the murder. In his statement, Defendant stated that the gun found at his house, a Glock 9mm, was purchased the previous Monday. Defendant stated that he bought the weapon from Alexandria Indoor Range and shot the weapon using ammo purchased at the range.

Detective Newcomb explained that Federal is a cartridge company that manufactures range ammo. According to Detective Newcomb, Federal marks the brass on the casings it manufactures with "FC." When asked to examine the 9mm casing found on March 14, 2014, on Alligator Bayou Road next to the victim's body, Detective Newcomb testified:

> A.     Yes sir. The head stamp is marked FC for Federal Cartridge and it's labeled 9mm Ruger and it has a silver primer. That's often seen on their range ammo. The primer has been struck by a Glock pistol. And you can identify that, it makes a small rectangular impression rather than a circular impression on the primer. And it has been fired.
>
> . . . .
>
> Q.     Is the marking that's on that consistent with the Federal RTP 9mm?
>
> A.     The cartridge itself, yes. And the primer strike is a Glock primer strike.
>
> Q.     Can you elaborate on what makes that, what makes the Glock primer strike distinctive?
>
> A.     Again, it's part of their firing pin assembly. Instead of a traditional firing pin it's strictly cylindrical and it makes a circular impact on the primer. More of the firing pin assembly extrudes while firing. And it's a small rectangular shape along with a small circular indentation on the primer.

On cross-examination, Detective Newcomb stated that he could not tell what generation of "Glock 19" fired the 9mm casing in State's Exhibit 16. Detective Newcomb acknowledged that he could tell only that it was fired by a Glock and that

54

there were "at least six or seven different models, Glock manufactured, that can fire a 9mm[.]"

The next witness, Hans Deselle, a detective with the Rapides Parish Sheriff's Office, executed a search warrant on the Worley residence on March 14, 2014. Outside of the residence, Detective Deselle saw a Harley Davidson trike and a white GMC pickup truck. Detective Deselle identified a photo of the front right wheel well of the GMC pickup parked next to the residence. We note that several photographs introduced into evidence have images of Defendant's truck and show dirt on one of his tires, on the tire well and on the chrome "nerf bar." As for inside the residence, the detective recalled finding a safe containing some pistol magazines that fit a Glock 9mm. Detective Deselle described the contents of the safe as he observed on that day: "There was some pistol magazines for a Glock 9mm. I think there was some ammunition. Maybe a holster or something in there." When asked if he took note of the variety of magazines, Detective Deselle testified:

A.  Yes, I did.

. . . .

A.  The magazines, once I got this safe back to CID where it could be properly inventoried and documented I noticed that the magazines were, I think they were KCL brand magazines. Let me refer back to my report real quick to make sure I'm not speaking out of turn here. Yes. They were KCL magazines.

Q.  Were there any other magazines? Any Glock brand magazines?

A.  I do not believe so.

Q.  Not in the safe at that time?

A.  Not in the safe. No.

Detective Newcomb also identified a picture labeled "W2" as a factory box for a Glock pistol.

55

On March 21, 2014, Detective Newcomb took additional photographs at the lab. Detective Newcomb testified:

Q.   Okay.   And that's H1.   How would you characterize that photograph?

A.   That's going to be, I think these are Glock magazines.

Q.   Okay.  And down below, what is that?

A.   Those are, they call them speed loaders.  It's a magazine loader assist.  It helps you put bullets in the magazine.

Q.   And that's H3.  Anything unusual about, and each of those are speed loaders?

A.   Yes, they are.

Q.   Okay.  And those are – I noticed they're different.  Do you know why they're different?

A.   I really couldn't tell you why they're different.  I do know when you buy a Glock pistol, because I've bought several, it generally comes with one.

Q.   Okay.  Is there a rational normal conclusion that one would reach whenever you see someone who has two separate speed loaders?

A.   That at some point they bought two Glocks.

As for the shell casing recovered from the crime scene, Detective Deselle testified that it was determined to have been fired by a Glock 9mm.

Detective Deselle testified that he viewed and collected a video clip from Country Living, which he estimated was approximately six miles from the Worley residence.  Detective Deselle also viewed the Outpost Store's video with Detective Lofton.  When asked if he personally confirmed the accuracy of the times on the videos, Detective Deselle testified:

A.   No, I did not.

Q.   In your report there are some estimate ranges for the videos.

A.   Yes.

Q.     And can you kind of tell me where those are sourced, please?

A.     I got those from the time that was displayed on the videos.  But because we were working with two different systems at two different locations, and one of the systems, the one at Country Living was extremely old, shall we say, and difficult to work with.  That's why I had to kind of give it an estimate.  But one of the things I used was the time and also the way that the shadows fall on the road in the morning.

Detective Deselle estimated that the vehicle passed by the Outpost Store between 8:30 and 8:50 and Country Living between 8:15 and 8:30.

Detective Deselle also compared the mud that was found on "the truck" to the dirt on Alligator Bayou and found that they were visually similar.  The actual analysis was done by "Baton Rouge's Soil Sciences Center."

On cross-examination, Detective Deselle testified that he collected a denim blue shirt from the Worley residence as it was believed to be the shirt Defendant was wearing the day he went to Renegade Harley Davidson.  According to the detective, the shirt contained reddish/brown stains which were thought to be blood stains. Testing on the shirt, however, revealed that the stains were not blood.

As for the times he estimated that the vehicle passed by Country Living, Detective Deselle agreed the vehicle could have passed a little earlier or a little later. The detective described the truck he saw pass Country Living between 8:15 and 8:30 as "a newer model white GM pickup truck" with a "little bit of chrome on the bottom of it."  Detective Deselle stated that the video from Country Living was a lot poorer quality than the video from the Outpost Store.  Detective Deselle testified that he could not tell from the Country Living video whether the truck was clean or dirty. Additionally, the detective could not make out any of the occupants in the truck. When asked if there was anything in particular that made him identify the truck as possibly being Defendant's truck, Detective Deselle replied, "Just that it was a newer model, single cab, white GM truck in that approximate time frame."

As for the time frame of the Outpost Store's video, Detective Deselle testified that he had no reason to disagree with Detective Lofton's estimation of 8:47.19 to 8:47.15, which fits within Detective Deselle's estimation of between 8:30 and 8:50. When asked if he and Detective Lofton agreed that "that was the same truck that you had seen earlier[,]" Detective Deselle testified:

A.    It certainly was similar.

Q.    Okay.  Any reason to believe that it might have been a different truck?

A.    No sir.  Just the times matched up too neatly.  And the truck was traveling the same way.  It did appear to be the same vehicle.

Q.    Okay.  Again, could you see the tag number on that truck?

A.    No, I did not.

Q.    Okay.  And the only way you could identify it was because it was a similar newer model GMC, white, single cab truck?

A.    That is correct.

Q.    Okay.  Any special markings on it that would identify it as Mr. Worley's vehicle?

A.    Not that would identify it as his vehicle specifically.  No sir.

Detective Deselle estimated that the distance between Country Living and the Outpost Store was seven or eight miles.  Since there were a lot of turnoffs between the two locations, the detective agreed that it could have been the same truck or not. When asked if he and Detective Lofton discussed the vehicle, Detective Deselle replied:

A.    We talked about that it fit the description of Mr. Worley's vehicle.  In the Outpost video you could see that it did in fact have the chrome step bar at the bottom.  And also in the Outpost video, that video was good enough quality that you could actually see that the, and this is actually on the return video but since you didn't ask me about that, I'm going to leave that alone.

Q.    Well, tell me about the return video.

A.      Well, on the return video you could actually see that there was some dirt and things like that across the bottom of the vehicle.

Q.      But on the vehicle when it was going out toward Dewey Wills, you couldn't see that at all?

A.      I would be guessing if I said yes or no.  To be honest with you.

Q.      Okay.  And again, as the vehicle is coming back, could you see the tag number from the back of the vehicle?

A.      No sir.  You could not.

Q.      Couldn't really identify it as being, definitely being Mr. Worley's vehicle?

A.      No sir.

Q.      Only that it was a late model GMC, white, single cab, pickup truck.

A.      Newer model, single cab, white, GMC pickup with the chrome step bars.  That's correct.

Q.      And we've already established there's more than one of those in Rapides Parish?

A.      Yes sir.

Turning to the speed loaders for a Glock that Detective Deselle previously testified about, the detective agreed that more than one new speed loader usually indicates a person bought more than one Glock.  When asked if the speed loaders are sold separately, Detective Deselle stated that he had never seen them sold separately but could not say that they were not.  Detective Deselle further stated that he had "never even looked for them, . . . because [he] never use[d] them."  The following colloquy ensued:

Q.      So, it may indicate that they bought more than one Glock?  It may indicate they just bought it on the market somewhere?

A.      Yes sir.  If I could understand why someone would want two speed loaders.  You can only use one at a time.

Detective Deselle agreed that Mike Stelly with the North Louisiana Crime Lab examined the shell casing found at the scene and determined that it was not fired by the Glock 19 found in Defendant's home. Finally, the detective testified that he did not have the shell casing tested for fingerprints.

The final witness to testify for the State was the daughter of the victim and Defendant, Rachel Worley Guidry. Mrs. Guidry testified that she last spoke with her mom on the phone the late afternoon/early evening of March 12, 2014, the day before she was murdered. Mrs. Guidry testified that her mom never mentioned that she was going to let Defendant trade in her vehicle for a trike.

Mrs. Guidry testified that she visited her mom and dad the first weekend of March before the murder and usually talked to her mom a few times a month. According to Mrs. Guidry, her mom never mentioned reconnecting with old friends or associating with a mixed-race couple from church. Mrs. Guidry also testified that her mom did not particularly like motorcycles. When asked if she knew of any conflict between her mom and dad over her dad buying motorcycles or other stuff, Mrs. Guidry replied: "I never witnessed any argument or disagreement. But you could tell when she was upset about it." According to Mrs. Guidry, her mom did not share much with her since she was the youngest of three and the only girl. The only vacation her mom mentioned possibly taking was a vacation to Disney with Mrs. Guidry's oldest brother. When asked if her mother mentioned going on a vacation on a bike, Mrs. Guidry replied, "No." According to Mrs. Guidry, her mom was not a social person and did not like to shop. She described her as a very compassionate and caring person and the best mom she could ask for. Finally, Mrs. Guidry testified that her dad would not have let her mom leave with people he did not know.

On cross-examination, Mrs. Guidry testified that her mom did not share anything with her about her marriage. Mrs. Guidry acknowledged that her father had bought motorcycles previously but had never heard her mom say that she agreed to it. In fact, Mrs. Guidry testified that she never heard her mom say anything or negative in front of her. Mrs. Guidry acknowledged that even though her mom did not like to shop, she did it when necessary. Finally, Mrs. Guidry moved out of the house in 2009, so she did not know what her mother's habits were between 2009 and 2014.

After the State rested its case, defense counsel called Detective Kimond Mims with the Rapides Parish Sheriff's Department. Detective Mims was called to the scene at approximately 2:00 p.m. on March 14, 2014. Detective Mims observed a white female laying on her side with her hands in her pockets and blood on the back of her head. Detective Mims found a bullet casing about five feet from the victim's body. Detective Mims took photographs of tire impressions, which looked like they had been there a while. When asked if the tire impressions matched the tires on Defendant's vehicle, Detective Mims replied: "It was – you couldn't determine because of the length of time. And the overlay. We couldn't determine." Detective Mims testified that he was not able to match the tires from Defendant's vehicle with the impressions at the scene. Detective Mims also collected four different cigarette butts from the area, and he believed the results of DNA testing on the butts was "no DNA." According to the detective, the autopsy showed the victim was shot in the back of the head but showed nothing else to lead him to the perpetrator. As for the dirt found on the shoes recovered from Sunrise Grocery, Detective Mims testified that there was not enough dirt to be tested. Finally, Detective Mims testified that none of the items he collected at the Worley residence were significant in identifying the person who killed the victim.

*Defendant's Argument in Brief*

Defendant asserts the evidence, which was purely circumstantial, failed to exclude every reasonable hypothesis of his innocence. Defendant argues that it made little sense for Defendant to kill the person who took care of him and who was the breadwinner of the family, especially when there were no known problems in their marriage. Defendant also contends the State failed to meet their responsibility of eliminating the possibility that the victim actually made it to Jena.

As for the shoes found at Sunrise Grocery, Defendant argues their evidentiary significance was null since the soil on the shoes did not match the soil from the location where the victim was found. Defendant also notes that the murder weapon was never found, and the Glock 9mm found at Defendant's house was excluded as the murder weapon. The surveillance video from the Outpost Store, Defendant argues, was of no significance since there was no tag or license plate visible in the video; thus, no witness could say the vehicle was Defendant's. According to Defendant, DNA analysis on cigarettes found at the scene excluded both the victim and Defendant as matches. Even though the dirt found on Defendant's truck was determined to be similar to dirt found at the murder scene, Defendant argues this was insignificant since the parties stipulated that Defendant often hunted at Dewey Wills Wildlife Management Area. Additionally, Defendant contends that tread marks on Defendant's tires could not be matched to tire marks found near the victim's body and suspected blood on the shirt Defendant was wearing that day was proven to not be blood.

As for the State's theory that Defendant killed his wife so that he could buy the trike, Defendant contends this was implausible since Defendant's children testified that even though the victim did not like Defendant buying motorcycles, she had ultimately conceded to such purchases in the past. Additionally, both of the

children testified that they could not be sure of their mom's attitude toward the purchase of the trike since they did not talk to her about her marriage. Finally, Defendant argues there was evidence that he had been considering buying the trike for months; thus, the purchase was not on a whim.

Even though the State implied Defendant killed the victim because he suggested they search in the area she was ultimately found, Defendant contends that numerous witnesses testified that the Dewey Wills Management Area was the natural place to search considering the victim was going to Jena. Ed Trahan, the Wildlife and Fisheries agent Defendant called to look for his wife, testified that Defendant did not ask him to search the specific area where the victim was found and testified that Defendant did not hunt that specific area.

As for the State's theory that Defendant was overly zealous in reporting the victim missing, Defendant contends the State argued out of both sides of its mouth—on one hand the State implied Defendant was an overly concerned husband who would not let his wife leave with someone he did not know, and on the other hand the State implied that Defendant's hasty reporting was proof of his guilt. Defendant argues "[t]here is no script that everyone must follow when they believe something bad may have happened to their spouse."

Finally, Defendant argues that the neighborhood video surveillance neither proves nor disproves Defendant's story. Defendant concludes by stating the following:

> Ultimately, the State's circumstantial evidence case did not add up to negate every reasonable hypothesis of innocence; the State did not prove its case beyond a reasonable doubt. The State could not match Michael to the murder weapon, his DNA to cigarettes at the scene, dirt on the shoes he threw away that day to dirt near Mary's body, tire marks at the scene, his truck on video passing a store on Highway 28, or any other physical evidence. The implied motive to kill Mary so he could get a trike is implausible considering she had previously relented in objections to him buying motorcycles and she was the

breadwinner and only one working in the family. Ultimately, it cannot be eliminated as a possibility that Mary went to Jena as she intended, but something happened to her on the way home. Had police sought Walmart's cameras or investigated the Jena angle at all, they may have been able to eliminate Michael as a suspect. . . . (Police never looked for the couple or investigated whether Mary made it to Jena). Instead, he now sits in jail for the rest of his life.

The prosecution has the burden of proving *each* element of the crime beyond a reasonable doubt. *See State v. Runyon*, 05-0036 (La.App. 3 Cir. 11/2/05); 916 So.2d 407, 416, *writs denied*, 06-1348 (La. 9/1/06); 936 So.2d 207 and 06-0667 (La. 11/17/06); 942 So.2d 526. The evidence was insufficient in this case to prove that Michael Worley killed his wife, Mary Worley. The conviction must be reversed and set aside and acquittal entered of record.

*The State's Argument in Brief*

The State asserts the evidence was sufficient for the jury to convict Defendant of second-degree murder. The State contends the jury's rejection of Defendant's hypotheses of innocence was reasonable considering the inconsistences in Defendant's statements, the video evidence, the testimony at trial, and the physical evidence. The State sets forth numerous specific inconsistences in Defendant's statements. For the reasons discussed below, we agree with the State.

*Analysis*

From the beginning, Defendant based his hypothesis of innocence on his claim that his wife did not return home after being picked up by a couple to go shopping in Jena. There were several inconsistencies, however, in Defendant's hypothesis. When Defendant first reported his wife missing to Deputy Dorsey, he stated that he saw his wife leave with a black male and white female. Defendant also told Ms. Corley, a Wal-Mart employee who worked with the victim, that he saw the vehicle in which the victim drove off. In his statements to police, however, Defendant said the victim was already gone by the time he got out of the shower. At first, Defendant claimed he did not know the type of vehicle the victim left in, but later told detectives that he remembered the victim telling him their vehicle reminded

64

her of his old Ford truck. In another inconsistent statement, Defendant told his friend and Wildlife and Fisheries Agent Ed Trahan, that the victim had left with friends the previous night to go to Jena.

There were also inconsistencies in Defendant's statements as to how the victim knew the couple she allegedly left with. Defendant told police that the couple was "from down south" while he told the victim's co-workers that the victim knew the couple from church. In his recorded statement, Defendant remembered that the victim had seen the couple about a month earlier and that seeing them again was like old times. Defendant later told police that the victim and the woman had gone to lunch a few times and that the victim had loaned the woman money. Later in the statement, Defendant claimed the man had just been released from prison three or four years earlier.

Defendant's statement to police that he had not corresponded by email regarding the purchase of a trike contradicted testimony by Renegade's internet manager that she had, in fact, corresponded with Defendant about the purchase of a trike.

Defendant's testimony regarding the throwing away of his shoes was also inconsistent with the video footage from Sunrise Grocery. Defendant told detectives that he threw one of the shoes away at Sunrise Grocery but that the other shoe had been thrown away about a week before. The video from Sunrise video and the shoes recovered by detectives, however, showed that Defendant threw both shoes away during his same visit to Sunrise Grocery.

There were witnesses, including Defendant's own son, who testified that Defendant's concern for his wife did not seem sincere and that Defendant's story did not seem believable. Deputy Dorsey, the deputy who received Defendant's initial report, testified that Defendant seemed nervous and "[n]ot too sincere." She also

testified that he would try to make himself cry but there were no tears. During Defendant's recorded statement, detectives noticed that Defendant had not shed any tears. Defendant's own son, Clinton, testified that Defendant's story was farfetched and unbelievable.

Additionally, both Clinton and his sister Rachel testified that the victim was not fond of motorcycles and was not fond of shopping, discrediting Defendant's claim that the victim wanted to spend the day shopping and discrediting his claim that the victim wanted to take his trike on trips. Clinton also disputed Defendant's statement in his interview that the victim would "get something in her head" and run off with friends. Clinton testified that he had never known his mom to do such a thing.

In his recorded interview, Defendant claimed that he did not tell the police to look for his wife in the Dewey Wills Wildlife Management Area. Detective Little and Ed Trahan testified, however, that Defendant told them that he believed the victim was missing in the Dewey Wills Management Area and that that area should be searched. Defendant also told Corporal Sharp that he had already called a search party to search the Dewey Wills Management Area.

Defendant told detectives in his recorded interview that his neighbor, Walter, reminded him that they had previously talked about the couple the victim left with and that Walter had warned Defendant that his wife was too trusting of them. At trial, however, Walter, denied ever making such a statement to Defendant.

Physical evidence contradicts Defendant's claim that his wife left home with a couple on the morning of her death. Although Defendant claimed his wife left with the couple around 8:45 a.m., video footage does not show any vehicles arriving or leaving the Worley residence at that time. In fact, nothing in the parties' stipulation as to the events recorded on the video surveillance shows the victim being

picked up. Additionally, although Defendant told police he was in the shower when the victim left at 8:45 a.m., video surveillance actually showed his truck leaving his residence at 8:32 a.m. As the State argues in its brief, Defendant never gave any explanation for his whereabouts between the time his truck left his residence at 8:32 a.m. and the time his truck returned to his residence at 10:29 a.m. The jury heard testimony from detectives, however, that video surveillance showed a truck similar to Defendant's truck going to and from the direction of the murder scene within this time period. While outside Defendant's residence, Detective Little noticed that Defendant's truck was muddy and appeared to have recently been driven in a muddy or dirt covered area. The soil sample from Defendant's truck was similar to the soil sample recovered from the dirt road near the victim's body.

Additionally, Defendant never offered an explanation as to why he changed clothes between the time he went to Sunrise Grocery and the time he went to Renegade Harley Davidson. Furthermore, the clothing worn by the victim when her body was found was not consistent with a day of shopping. Detective Smith noted that the victim was wearing her jacket and warm clothing as well as boots appropriate for walking or hiking. Also, the victim had left her purse and cellphone at home, carrying only her driver's license in her back pocket. Significantly, the victim was not carrying her employee Wal-Mart discount card even though she was supposedly going shopping at Wal-Mart. Finally, even though Defendant suggested the motive for killing the victim may have been robbery, the victim was still wearing her gold watch and rings. However, we note there is no indication that the $300.00 Defendant claimed the victim took from the safe was found on her body.

Finally, we note that the casing found at the crime scene matched a Glock 9mm gun. Although the Glock found at Defendant's residence was excluded as the

gun that fired the casing, evidence showed that Defendant did, in fact, own another Glock, the whereabouts of which was not determined.

The supreme court has stated:

> To preserve the role of the fact finder, *i.e.,* to accord the deference demanded by *Jackson*, this Court has further subscribed to the general principle in cases involving circumstantial evidence that when the fact finder at trial reasonably rejects the hypothesis of innocence advanced by the defendant, "that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville*, 448 So.2d 676, 680 (La.1984). A reasonable alternative hypothesis is not one "which could explain the events in an exculpatory fashion," but one that "is sufficiently reasonable that a rational juror could not 'have found proof of guilt beyond a reasonable doubt.'" *Id.* (quoting *Jackson*). Thus, in all cases, the *Jackson* standard does not provide a reviewing court with a vehicle for substituting its appreciation of what the evidence has or has not proved for that of the fact finder. *State v. Pigford*, 05-0477, p. 6 (La.2/22/06), 922 So.2d 517, 521; *State v. Robertson*, 96-1048 (La.10/4/96), 680 So.2d 1165, 1166. A reviewing court may impinge on the "fact finder's discretion . . . only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall*, 523 So.2d 1305, 1310 (La.1988).

*State v. Mack*, 13-1311, pp. 9-10 (La. 5/7/14), 144 So.3d 983, 989.

Considering all of the above, we find the jury's rejection of Defendant's hypothesis of innocence was reasonable, and the evidence was sufficient to convict him of second-degree murder.

## DECREE

For the foregoing reasons, Defendant's conviction is affirmed.

**AFFIRMED.**